Kathleen SULLIVAN

v.

**MEADE COUNTY INDEPENDENT SCHOOL DISTRICT NO. 101 et al.***

No. Civ. 74–5060.

United States District Court,
D. South Dakota.

Feb. 21, 1975.

\* **Editor's Note:** The opinion of the U. S. District Court for the Eastern District of Virginia in *Powers v. Sims and Levin Realtors*, published in the advance sheets at this citation (387 F.Supp. 1237), was substantially modified after advance sheet publication, and was withdrawn from the bound volume for republication as modified.

**1238**

John T. Hughes, Sturgis, S. D. for plaintiff.

David E. Morrill, Sturgis, S. D. for defendant.

## MEMORANDUM OPINION

BOGUE, District Judge.

Kathleen Sullivan, on December 10, 1974, filed the present action in United States District Court for the District of South Dakota, alleging jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1343. On December 12, 1974, a hearing was held before this Court on the plaintiff's application for a temporary re-straining order, restraining the named defendants from prohibiting the plaintiff from continuing her teaching duties pending the outcome of this litigation. At the conclusion of the hearing the Court denied the plaintiff's application for a temporary restraining order and set December 23, 1974, for a consolidated hearing on the preliminary injunction and the trial on the merits, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure.

The facts in the present controversy are not seriously disputed by the respective parties to this litigation, however, the legal significance or effect that flows from the facts are. Kathleen Sullivan was hired by the Meade Independent School District No. 101 (hereinafter referred to as School District) for the 1974–75 school year and assigned to grades one through four at the Union Center School, located in the unorganized community of Union Center, South Dakota. Kathleen Sullivan is a graduate of Long Island, New York University and holds a provisional certificate from the State of New York certifying her to teach in the area of nursery, kindergarten and grades one through six. Miss Sullivan also holds a valid South Dakota elementary certificate based upon reciprocity between New York and South Dakota. On August 27, 1974, the plaintiff commenced her teaching duties in Union Center, residing in a mobile home owned by the School District and provided for the plaintiff's use in a mobile home park at Union Center. Some time during the month of October an individual by the name of Donald Dragon moved into the trailer home with the plaintiff and began residing with her. The plaintiff and Mr. Dragon continued to reside in the School District's mobile home up to the time that the plaintiff was dismissed by the School Board. It is further admitted by both of the individuals that they are not related, nor are they married to each other. Nor, is it contended by any of the parties to this lawsuit that this was a covert relationship, in fact, the plaintiff freely admit-

ted when asked by any of the members of the community or the School Board, that she was living with Mr. Dragon, and that he was her "boy friend". The plaintiff also testified that many of the students of the school were aware of Mr. Dragon's presence at the trailer home, in that most of the children have visited her trailer home at some time or other, and that she has made no attempt whatsoever to hide Mr. Dragon's presence from them. Some time during the latter part of October Mr. Ronald Opstedahl, a parent of one of the plaintiff's students, contacted Carl Wahl, a member of the School Board, and defendant in this action, and complained to him of the living arrangement between the plaintiff and Mr. Dragon. Mr. Wahl thereupon notified the rural school principal, Wayne Musilek, and the school superintendent, Kenneth Hauge, of the living arrangement and of Mr. Opstedahl's complaint. On October 29, 1974, Mr. Musilek contacted the plaintiff with regard to the complaint. The plaintiff admitted to Mr. Musilek that her boyfriend was in fact living with her, and that she considered this to be a matter concerning her private affairs and not subject to the scrutiny of the school authorities. At this juncture Mr. Musilek notified her that if she did not discontinue living with Mr. Dragon that there was a great possibility that she could lose her job. To this the plaintiff responded that she had no intention of terminating her living arrangement with Mr. Dragon. On October 30, 1974, Mr. Musilek served upon Miss Sullivan a Notice of Hearing on Recommendation to Dismiss Teacher (Defendants' Exhibit #2), signed by Dr. Kenneth Hauge, Superintendent of Schools of Meade Independent School District #101. The notice advised the plaintiff that a hearing was to be held before the School Board wherein the superintendent would recommend that the plaintiff be dismissed from her teaching duties on the grounds of gross immorality. This notice was later amended on November 5, 1974, (Defendants' Exhibit #4) which changed the grounds for dismissal from that of gross immorality to gross immorality and incompetency. The hearing on said matter was held in executive session before the entire School Board on November 12, 1974, whereupon it was adjourned to November 22, 1974, and from that date to November 29, 1974. The plaintiff, together with her attorney, William H. Coacher, appeared before the School Board during the entire hearing which took place on these three separate dates. The plaintiff, in the hearing before the Board, was allowed to call witnesses on her own behalf, as well as cross examine those witnesses who presented testimony against her. During this entire proceeding all witnesses, including the School Board, were duly sworn and a stenographic transcript of the entire proceedings was made by a court reporter, which transcript is in evidence in the present case (Defendants' Exhibit #1). Several times during the proceeding, and prior to the rendering of a final decision, various members of the School Board again asked the plaintiff if a compromise could not be reached by her voluntarily terminating her living arrangement with Mr. Dragon. After hearing all of the various witnesses testimony and the arguments of counsel, the School Board presented its findings and decision (Defendants' Exhibit #10). Since the main contention of the plaintiff's action is that her dismissal was arbitrary, capricious and a violation of the due process clause of the Fourteenth Amendment and of the plaintiff's constitutional right of freedom of association and right to privacy, this Court believes that it would be beneficial at this point to set out the findings made by the school district in reaching their decision to terminate the plaintiff's employment contract. In their written findings of November 29, 1974, (Defendants' Exhibit #10), the School Board made the following determinations from the evidence presented at the hearing:

1. Kathleen Sullivan and Meade Independent School District entered

into a contract wherein Kathleen Sullivan was to serve as an elementary school teacher for a nine months period for the 1974-75 school year.

2. Kathleen Sullivan was assigned by the school district to teach grades one through four at the school of the school district at Union Center, South Dakota.

3. Meade Independent School District #101 of Meade and Lawrence Counties, South Dakota, covers a wide geographic area consisting of most of Meade County, South Dakota, and a smaller portion of Lawrence County, South Dakota. The district largely consists of rural area, sparsely settled covering a land mass of approximately 3000 square miles. Only two organized towns are included in said school district, Sturgis of a size of approximately 5000 population and Whitewood of a size of approximately 600. All other designated communities in the district are not organized, but are only postoffice designation or small unorganized villages.

4. The school of the school district situated at Union Center is a two teacher school, with Miss Sullivan assigned to the lower grades and Betty Albrandt assigned to the upper grades, five through eight.

5. Union Center is not organized but is a post office designation. Union Center has only a very small population of less than 100 persons residing in approximately 17 dwellings and is located approximately 60 miles from Sturgis, the nearest organized city.

6. The school district furnishes Kathleen Sullivan a mobile home in which to live and said mobile home is situated at a small trailer court at Union Center, South Dakota.

7. The trailer court in which Miss Sullivan lives is approximately one-eighth of a mile from the school house in which she teaches.

8. The trailer court in which Kathleen Sullivan resides contains approximately five mobile homes and residing in those mobile homes are some of her students.

9. Miss Sullivan has nine students from seven homes assigned to her classroom.

10. Miss Sullivan at times has had the students play in the vicinity of her mobile home and at times has had students visit her in her mobile home.

11. Miss Kathleen Sullivan is not married.

12. Donald Dragon, resides in the mobile home of Miss Kathleen Sullivan and he has resided therein for most of the 1974-75 school year to date.

13. Miss Sullivan and Donald Dragon represent to the community that Donald Dragon is Miss Sullivan's boyfriend; and Miss Sullivan has represented to members of the public that some day she may marry Donald Dragon.

14. Donald Dragon and Miss Sullivan attempted to rent a house in which both of them intended to reside from Mr. and Mrs. Ronald Opstedahl at the beginning of the school year term of 1974-75.

15. Miss Sullivan in no way hides the fact that Donald Dragon and she are living together in the mobile home and she does not deny that they are doing so.

16. Students of Miss Sullivan and their parents are aware that Miss Sullivan and Donald Dragon are living together in the mobile home and that they are not married.

17. Miss Sullivan refused to answer questions by school authorities concerning whether or not she and Donald Dragon engaged in sexual intercourse but she does admit to school authorities that she and Donald Dragon are living together and she in no way explains any other inference other than that they do live in a similar fashion as husband and wife.

18. Kathleen Sullivan and Donald Dragon are of approximately the same age in their middle twenties.

19. Miss Sullivan and Donald Dragon are not related.

20. Mr. and Mrs. Ronald Opstedahl, parents of Ronda, who is a first grader in Miss Kathleen Sullivan's class and who reside near Union Center, South Dakota, complained to school authorities of the fact that Miss Sullivan was living with a boyfriend and that such was not a good example for her students.

21. Upon receiving said complaint, the principal of the school, Wayne Musilek, confronted Kathleen Sullivan and asked her if she were willing to make other living arrangements concerning Donald Dragon, and she told the principal that she would not do so, that she was living with him, but did not believe there was anything wrong with it, and that she did not feel that it was any business of the school authorities what she did in her private life. She further informed Mr. Musilek that she intended to keep on living with Donald Dragon.

22. The Opstedahls and Mrs. Lloyd Wilcox, one of the parents of another student in Miss Sullivan's class, have stated to the board that they were not in favor of Miss Sullivan continuing to teach under such circumstances. One parent for each of three of the other students in Miss Sullivan's class testified that they thought Miss Sullivan was a good teacher and wanted her to continue notwithstanding her living conditions, and the parents of two of the other students of Miss Sullivan did not appear or express any desires in the matter.

23. Petitions have been filed with the school board containing the signatures of 140 residents of the Meade Independent School District requesting the dismissal of Kathleen Sullivan as a teacher. Most of the persons signing said petitions are residents of the rural area of the district which would be similar area to the Union Center area of the district and all of which would have similar moral standards and social mores.

24. Miss Sullivan on more than one occasion was asked before the board at the formal hearing as to whether or not she would be willing to have Donald Dragon live elsewhere but she refused to do so, even if her employment was in jeopardy.

25. Superintendent Kenneth Hauge has not made any specific recommendation to the board, but has brought the charges to the board so they could determine what decision to make. Dr. Hauge and Mr. Musilek did express their opinion, however, that such conduct on the part of Kathleen Sullivan did violate basic moral standards of the community and that it would and does have an effect on her competency to teach in the school as long as she continues to live with a man in close proximity to the school with full public knowledge of all persons concerned.

26. A moral standard of the community of Union Center and its surrounding area as well as the rest of the rural area of the Meade Independent School District, is that two adult persons male and female, should not live together in the same fashion as husbands and wives do without being married and that to do otherwise constitutes gross immorality in the eyes of the vast majority of the public in said school district.

27. From the fact that Kathleen Sullivan admits that she is living with Donald Dragon without giving any explanation to overcome the obvious inferences, the fact that they are of approximately the same age in the middle twenties, that they represent to the public that Donald Dragon is Miss Sullivan's boyfriend and that they may get married some day coupled with the refusal of Miss Sullivan to answer questions concerning sexual relations between the two parties lead to a strong inference that the two are in fact living together in the same intimate fashion as a husband and wife but without the benefit of matrimony.

29. The manner in which Kathleen Sullivan and Donald Dragon live together in the rural community of Union Center leads the public in the area, including the parents of Kathleen Sullivan's students, as well as the students to believe that Kathleen Sullivan and Donald Dragon are living in the same intimate manner as a husband and wife, without the benefit of matrimony.

30. As long as Miss Sullivan continues to reside with Donald Dragon without the benefit of matrimony, she is not competent to teach in the school at Union Center for which she was employed because the conduct of her personal life in such manner will cause the public to believe that she is violating a standard more of the community and that such is not a proper example for the students she teaches as well as other students who come in contact with her; and that at least some of the parents of the students whom she teaches will not want their students to continue to be taught by her because of the bad example, and that the knowledge of the students of the conduct of the teacher not approved by the community is likely to cause disciplinary problems in the teacher's classroom and will affect her ability to teach.

31. The conduct of the personal life of Kathleen Sullivan with regard to living with Donald Dragon is well known to the community of Union Center and the surrounding area and such conduct has caused a substantial public reaction against the continued employment of the teacher in the small country school and this public reaction has caused opinions to be formed as to Miss Sullivan's morality which has made her unacceptable to a large portion of the public in and about Union Center and that such reputation of Miss Sullivan has made it extremely difficult for her to exert the proper authority and respect of her students and to obtain the necessary respect, communications and support of the public and parents which will be necessary to effectually carry out the school program.

32. The conduct of Miss Sullivan in living with Donald Dragon without the benefit of marriage and under the claim that it is not wrong to do so is an open and public affront to community mores of the rural area of the Meade Independent School District.

33. In view of Miss Sullivan's claim that she intends to continue to live as in the past, the school board believes that if she is allowed to continue to teach that the integrity of the schools in Meade Independent School District will be materially damaged and that other teachers with similar beliefs are likely to be attracted to the district thereby further lowering the standards and integrity of the schools.

34. The personal life engaged in by Miss Sullivan and admitted by her constitutes a bad example for her students who are taught by example as well as by lecture.

35. During the third session of these proceedings before the School Board, Miss Sullivan did offer to move from the school's mobile home to a location approximately ten miles from the school but Donald Dragon would still be living with her. Although recognizing that this betters the situation, the School Board still finds that ten miles still places the teacher in the same rural attendance area of the school and so much notoriety has now been created that the patrons, parents, and the students of the attendance area will still continue to be aware of the situation with the same effect on her classroom teaching. Due to the sparse population of the Union Center area, ten miles is still in close proximity to the school house.

36. Notwithstanding these findings, the School Board does again offer to Miss Sullivan the right to continue to teach for the 1974–75 school year if she ceases to live with a man to whom she is not married. If she turns down this offer, the following decision is adopted.

Miss Sullivan having again failed to agree to change her living situation, it is the decision of the school board of Meade Independent School District # 101 of Meade and Lawrence Counties, South Dakota, that Kathleen Sullivan's employment with the school district be and the same is immediately terminated and she shall be paid the sum of $893.34 which in addition to what she has already been paid shall be complete and full compensation for all services rendered by her for said school district. This amount shall be paid when all school property in her possession has been returned to the school district in satisfactory condition.

In answering the plaintiff's complaint in the present action the defendant School Board incorporated the motion to dismiss, based upon the grounds and for the reasons that the defendant School District is not a "person" within the meaning of 42 U.S.C. § 1983. The Court will first address the jurisdictional issue, and then proceed to the plaintiff's due process claim.

## I.

■■ The controversy over the question of whether or not a political subdivision of a state is a "person" within the meaning of 42 U.S.C. § 1983 began with the United States Supreme Court decision in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). In that case the Supreme Court decided that a political subdivision of a state *could not be sued for monetary damages* on the basis of *respondeat superior* for the transgressions of its employees. The question, however, that was left unanswered was whether or not injunctive and declaratory relief would be allowed against these bodies politic. At this juncture a split of authority developed in the various circuit courts of appeals. The Eighth Circuit Court of Appeals has, in the past, permitted suits for injunctive relief under 42 U.S.C. § 1983 against school boards. *See, e. g.,* Floyd v. Trice, 490 F.2d 1154, 1156 n. 1 (8th Cir. 1974); Strickland v. Inloe, 485 F.2d

186, 189 (8th Cir. 1973). The propriety of naming a school board as a party defendant has, however, come into question since the recent Supreme Court decisions of Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), and the recent Eighth Circuit Court of Appeals decisions in the cases of Bramlet v. Wilson, 495 F.2d 714 (8th Cir. 1974); and Prostrollo v. University of South Dakota, 507 F.2d 775, n. 1 (8th Cir. 1974). The *Moor* and *City of Kenosha* cases held that a municipal corporation is not a suitable entity under § 1983 even for the purposes of equitable relief. The Eighth Circuit Court of Appeals in the *Prostrollo* case in a footnote noted that "It is fundamental that the University of South Dakota and the corporate body constituting the Board of Regents, both political subdivisions of the state, may not be sued under the Civil Rights Act since neither entity constitutes a 'person' within the meaning of § 1983. [City of] Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); Jorden v. Metropolitan Utilities District, 498 F.2d 514 (8th Cir. 1974); *cf.*, Board of Trustees v. Davis, 396 F.2d 730 (8th Cir.), cert. denied, 393 U.S. 962, 89 S.Ct. 401, 21 L. Ed.2d 375 (1968)." The Eighth Circuit in Bramlet v. Wilson, *supra,* did not pass upon the question of whether *Moor* and *Kenosha* were equally applicable to school board entities, since in that case the party defendants were the individual members of the board. In light of the Eighth Circuit Court of Appeals statement in the *Prostrollo* case, this Court feels compelled to dismiss the plaintiff's action against Meade County Independent School District # 101. Since the plaintiff, however, has joined the party defendants in their individual capacities, the jurisdictional requirements of § 1983 have been met and the individual defendants may properly be sued under the Civil Rights Act. *See,* Monroe v. Pape,

365 U.S. 167, 171–172, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961).

## II.

The main contention of the plaintiff's complaint is that the school district's action in dismissing her was a denial of substantive due process under the Fourteenth Amendment to the United States Constitution which incorporates the First Amendment rights to privacy and freedom of association. In light of the Eighth Circuit Court of Appeals decision in Buhr v. Buffalo Public School District # 38, 509 F.2d 1196, 1974, it is this Court's belief that it has jurisdiction to determine whether the school district acted unreasonably, arbitrarily, capriciously or unlawfully in its discharge of the plaintiff.

The plaintiff urges upon this Court that her personal life outside of the classroom, and specifically her relationship with Mr. Dragon, is an activity which is constitutionally protected within the meaning of the "right to privacy". This Court is well aware that various forms of association which are not political in the normal use of the term, are protected by various amendments to the Constitution. NAACP v. Button, 371 U.S. 415, 430–431, 83 S.Ct. 328, 336–337, 9 L.Ed.2d 405 (1963). Even if this Court were to adopt the position that the plaintiff's conduct was protected within the meaning of the "right to privacy", that finding would not be determinative of the issues presented in the case at bar. The Supreme Court of the United States in the case of Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), held that the constitutionally protected right of freedom of speech may be regulated in "carefully restricted circumstances." The Supreme Court of the United States has also approved inquiries by boards of education into the personal associations of a teacher. *See,* Beilan v. Board of Education, School District of Philadel-

phia, 357 U.S. 399, 406, 78 S.Ct. 1317, 1322, 2 L.Ed.2d 1414 (1958). The Supreme Court of the United States in the case of Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952), made the following statement with regard to a school board's ability to examine the fitness of a public school teacher:

"A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the school as a part of ordered society, can not be doubted." 342 U.S. at 493, 72 S.Ct. at 385.

Thus, in the present case, the question presented is whether the basis of the plaintiff's dismissal was arbitrary and capricious and therefore constituted an impermissible reason for terminating her employment. To be successful in the prosecution of a substantive due process claim, the plaintiff must prove:

". . . that each of the stated reasons [underlying her dismissal] is trivial, or is unrelated to the educational process or· to working relationships with the educational institution, or is wholly unsupported by a basis in fact." [McEnteggart v. Cataldo, 451 F.2d 1109, 1111 (1st Cir. 1971), cert. den. 408 U.S. 943, 92 S.Ct. 2878, 33 L.Ed.2d 767 (1972); as cited in Fisher v. Snyder, 476 F.2d 375, 377 (8th Cir. 1973).]

The plaintiff in urging her position that her dismissal was arbitrary and capricious and based upon impermissible grounds, relies primarily upon the Eighth Circuit Court of Appeals opinion in Fisher v. Snyder, 476 F.2d 375, (1973). In the *Fisher* case, members of the School Board of a rural Nebraska county district, dismissed Mrs. Frances Fisher, a middle-aged divorced high school teacher, at the close of the 1972 school year, giving as a reason her "unbecoming conduct" outside the classroom. Mrs. Fisher lived in a one-bedroom apartment in the small community of Tryon, Nebraska. Her married son, then twenty-six years old, lived and taught in the neighboring town of Stapleton, Nebraska. On several occasions, young ladies, married couples, and other friends of her son, some being young men, visited Tryon. Because of the size of the town, hotel and motel accommodations were virtually nonexistent in Tryon and Mrs. Fisher followed the advice of the secretary of the school board and allowed these guests to stay overnight at her apartment. A friend of Mrs. Fisher's son, Cliff Rowan, age 26, was a frequent visitor of Mrs. Fisher during the 1972 school year. In the spring of 1972, Mr. Rowan spent about a week in Tryon visiting various school classes as a means of fulfilling certain of his college requirements. Because of the various visitations by young men during the 1972 school year in the apartment of Mrs. Fisher, the county school board notified Mrs. Fisher that her contract would not be renewed at the end of the 1972 school year because of "conduct unbecoming a teacher." The Eighth Circuit Court of Appeals upheld the district court's determination that the dismissal was impermissible as being arbitrary and capricious in violation of Mrs. Fisher's right to substantive due process under the Fourteenth Amendment. In the Eighth Circuit's opinion the Court notes that the school board did not charge Mrs. Fisher with actually committing immoral conduct, but rather that the inferences from her social behavior are that there is a strong potential for sexual misconduct, thereby constituting social misbehavior that is not conducive to the maintenance of the integrity of the public school system. 476 F.2d at 377. The reasons relied upon by the Eighth Circuit Court of Appeals in upholding the district court's determination that Mrs. Fisher's dismissal was arbitrary and capricious are rel-

evant here in determining whether the plaintiff in the present case has met her burden of proof that her dismissal was arbitrary and capricious. The Court in *Fisher* first noted that the lack of evidence offered in support of the school board's conclusion that Mrs. Fisher was guilty of unbecoming conduct was the fact that she had overnight guests. The Court went on to reason that the mere presence of these guests in her home provided no proof beyond the subtle implication and innuendo that Mrs. Fisher was guilty of immoral conduct, and that idle speculation certainly does not provide a basis in fact for the inference "there was a strong potential [for] sexual misconduct" and therefore Mrs. Fisher's activity was "social misbehavior that is not conducive to the maintenance of the integrity of the public school system." *Id.* at 378. The Eighth Circuit agreed with the district court that "at most, the evidence may be said to raise a question of Mrs. Fisher's good judgment in her personal affairs, when measured against an undefined standard which someone could suppose exists in a small town in Nebraska." *Id.* at 378.

To further buttress their position that there was no factual basis underlying the school district's decision, the Court stated that the record contained considerable evidence which negated any inference of improper or immoral conduct by Mrs. Fisher. Specifically, that she did not attempt to conceal the presence of Mr. Rowan, but instead inquired of the school board's secretary about accommodations in Tryon for these guests, and she was advised to have them in her home because other accommodations were so limited. The Court in its final paragraph further relied upon the fact that "the openness of the association, the age differential between Mrs. Fisher and her guests, would seek to belie any inference of impropriety." *Id.* at 378. The final factor that the Court relied upon in the *Fisher* case was that the two local citizens of Tryon who were witnesses before the school board cast no aspersions upon Mrs. Fisher's charac-

ter or fitness as a teacher. "No evidence of a community reaction against Mrs. Fisher has been presented . . . ." *Id.* at 378.

The plaintiff in her brief urges upon this Court that the facts of the *Fisher* case are dispositive of the case at bar. At this juncture the plaintiff contends that in the case at bar there is no showing of any sexual misconduct, and therefore, like the *Fisher* case, the plaintiff is being condemned by implication and innuendo. This Court, however, believes that the facts presented in the *Fisher* case are inapposite and of no precedential value in deciding the case at bar. In the present case the finding of whether or not the plaintiff's discharge was proper, does not rest solely upon the correctness of the school board's inference of what occurred in the mobile home between the plaintiff and Mr. Dragon. Instead, the overriding question presented is whether the school board could proscribe this conduct, because of their belief that it would have an adverse effect upon the school children, thus making the plaintiff incompetent to teach in their school system. This Court does not believe that the *Fisher* case mandates that an actual showing of sexual misconduct must be made for the school board to attach an inference of impropriety. Unlike the *Fisher* case, Mr. Dragon is not a casual guest in the plaintiff's residence, rather he is a permanent occupant within the home. Further, the plaintiff makes no attempt to deny the fact that Mr. Dragon is her "boyfriend". Thus, even if the school board were correct in inferring that the plaintiff and Mr. Dragon were living as husband and wife without the benefit of matrimony, the question is still unanswered of whether they were proper in proscribing this conduct as being immoral and affecting her competency to teach in the school system.

As has been previously stated in this opinion, a school board may legitimately inquire into the character and

integrity of its teachers. *See*, Beilan v. Board of Public Education, *supra*; Adler v. Board of Education, *supra*. However, the conclusions that a school board draws from these inquiries must not be trivial or unrelated to the educational process or to working relationships within the educational institution. Thus, there must be a nexus between the conduct to be proscribed and the workings of the educational system. In seeking to justify dismissal in this case, the school board found that the plaintiff's conduct was an affront to the moral standards of the Union Center community, and that its continuance sets a bad example for the young impressionable people that she is teaching. This Court, in reviewing the proceedings of the school board, cannot say that the reasons for the plaintiff's discharge were unrelated to the educational process or the working relationship within the educational institution. In the present case the school board was reasonable in its belief that the plaintiff's personal conduct would have an adverse effect upon the pupils she was teaching. In the hearing before the board, a petition with approximately 140 signatures was presented showing a strong community reaction to the plaintiff's conduct outside the schoolroom. It would seem reasonable for the school board to conclude that controversy between the plaintiff and the parents and the community members of this locale would make it difficult for Miss Sullivan to maintain the proper educational setting in her classroom. Thus, this is not a case where a teacher is dismissed for past conduct which has no relationship to her fitness to teach, since the school board gave Miss Sullivan every opportunity to discontinue her living arrangement with Mr. Dragon, and complete the remainder of the 1974–1975 school year.

### III.

The final claim that the plaintiff makes is that S.D.C.L. § 13–43–15 which was relied upon by the defendants as a statutory basis for dis-charging the plaintiff, is so vague that it violates the due process clause of the Fourteenth Amendment. Before passing on the substance of this argument, this Court feels that it is necessary to determine whether it has jurisdiction over the claim. The three-judge court statute, 28 U.S.C. § 2281, places severe limitations upon a district court's ruling on the constitutionality of state statutes. For § 2281 to be applicable, a state statute or administrative order must be challenged, a state officer must be a party defendant, injunctive relief must be sought, and it must be claimed that the statute or order is contrary to the Constitution of the United States. Wright, Law of Federal Courts (2nd Ed. 1970). Thus, a three-judge court should be invoked only where the complaint seeks injunctive relief, and it is not necessary if the constitutionality of a statute is brought into question without any prayer for the restraint of its enforcement. Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). Since in the present case the plaintiff asks for injunctive relief against the school board, and not for permanent injunctive relief against the enforcement of the statute in question, this Court believes that it has jurisdiction to pass upon the constitutional claim presented by the plaintiff.

The Supreme Court of the United States in its recent decision of Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), passed upon the issue of whether a section in Lloyd-LaFollette Act, 5 U.S.C. § 7501(a), which authorized the removal or suspension without pay of federal employees, was constitutionally sufficient against the charges both of overbreadth and of vagueness. The clause in question in that case provided that a federal employee could be removed or suspended for "such cause as will promote the efficiency of the service." 416 U.S. at 158, 94 S.Ct., at 1646. In passing on the problem that is presented by constitutional attacks upon statutes, the Court reiterated language from their prior de-

cision of United States v. Harriss, 347 U.S. 612, 618, 74 S.Ct. 808, 812, 98 L. Ed. 989 (1954), where they stated:

"[T]here are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest. '[T]he general class of offense to which . . . [the provisions are] directed is plainly within [their] terms . . ., [and they] will not be struck down as vague, even though marginal cases could be put where doubts might arise.' "

Thus, the question presented within the present case would seem to be whether the ordinary person exercising ordinary common sense could sufficiently understand, and was provided with a fair warning that certain kinds of conduct fall within the definitions of "gross immorality" and "incompetency". At this juncture the plaintiff contends that she did not have a warning that her living arrangement with Mr. Dragon could possibly be construed as being grossly immoral. This Court, in reviewing the evidence, cannot agree that the plaintiff lacked sufficient warning as to the kind of conduct prohibited. The record before this Court, and before the school board, is replete with admonitions from various school authorities that they considered her conduct to fall within the meaning of the statute, and that if it was not discontinued the board would take action. Thus, the plaintiff in this case was not discharged based upon past conduct which occurred before ample warning was given, but rather, upon the plaintiff's failure to discontinue her conduct after being given fair warning. A similar argument was made in Beilan v. Board of Education, 357 U.S. 399, 78 S. Ct. 1317, 2 L.Ed.2d 1414 (1958), where the petitioner contended that he was de-

nied due process because he was not sufficiently warned of the consequences of his refusal to answer his superintendent. There the Supreme Court, rejecting his argument, stated:

"The record, however, shows that the Superintendent in his second interview, specifically warned petitioner that his refusal to answer 'was a very serious and a very important matter and that failure to answer the questions might lead to his dismissal.' That was sufficient warning to petitioner that his refusal to answer might jeopardize his employment. Furthermore, at petitioner's request, his Superintendent gave him ample opportunity to consult counsel. There was no element of surprise." 357 U.S. at 408, 78 S.Ct. at 1323.

Thus, this Court does not find that the statute in question would not sufficiently apprise the ordinary person exercising ordinary common sense, of what conduct was prohibited. It would be entirely impracticable to charge the legislature with the duty of specifying every possible act that would fall within the definition of the terms in question. As was stated by Judge Leventhal, writing for the Court of Appeals for the District of Columbia:

" . . . it is not feasible or necessary for the Government to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees includes 'catchall' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.' We think it is inherent in the employment relationship as a matter of common sense if not [of] common law that [a government] employee . . . cannot reasonably assert a right to keep his job while at the same time he inveighs against his superiors in public with intemperate and defamatory [cartoons]. . . . [Dismissal] [in such circumstances] [neither] comes as an unfair surprise [nor] is so unexpected . . . as

to chill . . . freedom to engage in appropriate speech." Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 1648, 40 L.Ed.2d 15 (1974), citing Meehan v. Macy, 129 U.S.App.D.C. 217, 392 F.2d 822, 835.

## IV.

In conclusion it is this Court's belief that the plaintiff has failed to show that the school board was arbitrary and capricious in her dismissal. This Court's decision in no way stands for the proposition that school boards have unfettered discretion in dealing with their employees. It simply stands for the proposition that the school board could proscribe the conduct of the plaintiff in the present case and, that the reasons for dismissal were related to the proper functioning of the educational system, and had a basis in fact. Therefore, in view of the foregoing, plaintiff's request for injunctive and declaratory relief will be denied and the action will be dismissed. The foregoing shall constitute the findings of fact, and conclusions of law in this case in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.