Kathleen SULLIVAN, Appellant,

v.

MEADE INDEPENDENT SCHOOL DISTRICT NO. 101 et al.,
Appellees.

No. 75–1315.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 17, 1975.

Decided Feb. 26, 1976.

Rehearing Denied March 24, 1976.

---

Steven W. Sanford, Sioux Falls, S. D., Ina A. Litke, Vermillion, S. D., Marilyn G. Haft, American Civil Liberties Union, New York City, and Michael B. Crew, Vermillion, S. D., for appellant.

David E. Morrill, Morrill & Hansen, Sturgis, S. D., for appellees.

Before HEANEY, BRIGHT and WEBSTER, Circuit Judges.

BRIGHT, Circuit Judge.

This appeal presents the primary question of whether the school board of a small rural community violated the constitutional rights of a single young woman elementary teacher by discharging her in midterm as incompetent to continue teaching because she insisted upon sharing her dwelling located within the school community with a single man.[1]

Following her discharge, the teacher, Kathleen Sullivan, brought an action in federal district court under 42 U.S.C. § 1983 against the Meade County (South Dakota) School District No. 101, members of the school board, and school administrators seeking reinstatement, damages, and other relief.[2] She claimed that the dismissal violated her rights to privacy and freedom of association as well as her fourteenth amendment rights to substantive due process and equal protection of the laws. The district court dismissed the complaint against the Board, as an entity, ruling that it was not a "person"

within the meaning of § 1983.[3] Following a plenary trial, the district court determined that the defendants in dismissing Ms. Sullivan had not violated her constitutional rights and had acted within a proper sphere of authority in conformity with South Dakota state law, which, among other things, grants a school board power to dismiss a teacher at any time for gross immorality or incompetency. See S.D. Compiled Laws Ann. § 13-43-15.

No dispute exists as to the essential facts. The Meade County School Board employed Ms. Sullivan for the 1974-1975 school year to teach the nine students enrolled in grades one through four of the Union Center Elementary School. The Union Center schoolhouse serves students from Union Center and outlying areas in grades one through eight. Another teacher instructed grades five through eight.

The school district is predominantly rural, containing only two organized municipalities—Sturgis, population about 5,000, and Whitewood, population 600. Union Center lies approximately 60 miles east of Sturgis. Union Center, within this school district, is an unincorporated community of approximately 100 persons and contains approximately 17 dwellings including units located in a mobile home park which is about one-eighth mile from the Union Center Elementary School. Ms. Sullivan lived in the mobile home park in a mobile home furnished by the school board.

Ms. Sullivan began her teaching duties on August 27, 1974. In October, a male friend, Donald Dragon, also from New York, came to visit her. Thereafter and until her dismissal on November 29, 1974, Ms. Sullivan and Mr. Dragon lived together in the trailer home without any attempt to conceal their living arrangements.[4] Ms. Sullivan's students and

---

1. The opinion of District Judge Andrew Bogue is reported at 387 F.Supp. 1237. That opinion elaborates on the facts and incorporates the full written findings of the school board.

2. For convenience the various appellees will be referred to collectively as the "Board." The Board as a corporate entity is no longer involved in this action. *See* note 3, *infra.*

3. Appellant does not challenge this ruling. *See Prostrollo v. University of South Dakota,* 507 F.2d 775, 777 n.1 (8th Cir. 1974).

4. Both parties are about 25 years of age. Ms. Sullivan has described Mr. Dragon as her boyfriend and has indicated that they may some day marry.

their parents soon became aware that she and Mr. Dragon were living in the same trailer, and the community recognized that the couple were not married.

This lifestyle offended the traditional mores followed by residents of this rural South Dakota community and provoked protests from some parents of children attending the school and others in the school community. An initial protest by parents of a student attending Ms. Sullivan's class came to the attention of the school board, the school principal, and the school superintendent. School officials first sought to resolve the complaint informally with Ms. Sullivan. This effort failed when Ms. Sullivan, on October 29, 1974, advised the school principal that her living arrangement with Mr. Dragon was private, not subject to the scrutiny of the school authorities. The principal advised Ms. Sullivan that the continuance of her living arrangement could jeopardize her job.

In early November, the Board caused a notice to be delivered to Ms. Sullivan advising her of a hearing on the school superintendent's recommendation that she be dismissed on grounds of "gross immorality and incompetency as the alleged immoral conduct affects the teacher's competency to teach." The notice advised her of her right to appear with an attorney and to present evidence to the Board. It further stated:

The information which will be presented to the board is that that [sic] you have voluntarily furnished your supervisor information wherein you have admitted that you are living with a man to whom you are not married.

I further advise that this letter and all matter relative to it that have come to the attention of the school district is being kept in strictest confidence and that the hearing to be held before the school board will not be open to the public but will be restricted to members of the school board, business manager, superintendent, principal, and the school district's attorney and yourself, whatever witnesses or representatives you wish to bring to the hearing, and witnesses called by the school district.

During the hearing, the Board asked Ms. Sullivan on several occasions whether she would be willing to have Dragon live elsewhere but she responded negatively.[5] Finally, the Board adopted its decision to dismiss after giving Ms. Sullivan the opportunity to cease living with a man to whom she was not married during the balance of the school year. When Ms. Sullivan rejected this option, the Board's decision became effective.[6]

The appellant's brief indicates some misconstruction of the language employed in the Board's findings. Ms. Sullivan is understandably concerned that

5. The Board commented in its findings that at its third session Ms. Sullivan did offer to move to a location 10 miles away from school. The Board further observed:

Although recognizing that this betters the situation, the School Board still finds that ten miles still places the teacher in the same rural attendance area of the school and so much notoriety has now been created that the patrons, parents, and the students of the attendance area will still continue to be aware of the situation with the same effect on her classroom teaching. Due to the sparse population of the Union Center area, ten miles is still in close proximity to the school house. [*Sullivan v. Meade Cty. Independent School District No. 101,* 387 F.Supp. at 1243.]

6. In finding number 36, the Board stated:

Notwithstanding these findings, the School Board does again offer to Miss Sullivan the

right to continue to teach for the 1974–75 school year if she ceases to live with a man to whom she is not married. If she turns down this offer, the following decision is adopted.

Miss Sullivan having again failed to agree to change her living situation, it is the decision of the school board of Meade Independent School District # 101 of Meade and Lawrence Counties, South Dakota, that Kathleen Sullivan's employment with the school district be and the same is immediately terminated and she shall be paid the sum of $893.34 which in addition to what she has already been paid shall be complete and full compensation for all services rendered by her for said school district. This amount shall be paid when all school property in her possession has been returned to the school district in satisfactory condition. [387 F.Supp. at 1243.]

she not be branded "grossly immoral" and "incompetent." However, those are "terms of art." They derive from the South Dakota statute which authorizes dismissal for a "plain violation of contract, gross immorality, incompetency, or [a] flagrant neglect of duty." S.D.Compiled Laws Ann. § 13–43–15.

The Board was apparently disturbed by the term "gross immorality." For that reason, Ms. Sullivan's original notice was amended to include the ground of incompetence. At the hearing Dr. Hague, the superintendent of the school district, emphasized that "maybe the word gross is somewhat of an exaggeration" and that it actually meant only conduct seriously varying from community standards.

Even this softened version apparently was too strong for the Board. As a result, *it did not dismiss Ms. Sullivan on the express ground of immorality.* The Board did note that her conduct was considered "grossly immoral" by many local residents.[7] However, the Board directly relied upon this observation only to support its conclusion that "[a]s long as Miss Sullivan continues to reside with Donald Dragon * * * she is not competent to teach * * * at Union Center * * *." 387 F.Supp. at 1242.

The Board was clear that this term as well was employed only in a limited sense. The crucial findings of the Board are as follows:

> As long as Miss Sullivan continues to reside with Donald Dragon without the benefit of matrimony, she is not competent to teach in the school at Union Center for which she was employed because the conduct of her personal life in such manner will cause the public to believe that she is violating a standard more of the community and that such is not a proper example for the students she teaches as well as other students who come in contact

with her; and that at least some of the parents of the students whom she teaches will not want their students to continue to be taught by her because of the bad example, and that the knowledge of the students of the conduct of the teacher not approved by the community is likely to cause disciplinary problems in the teacher's classroom and will affect her ability to teach.

> The conduct of the personal life of Kathleen Sullivan with regard to living with Donald Dragon is well known to the community of Union Center and the surrounding area and such conduct has caused a substantial public reaction against the continued employment of the teacher in the small country school and this public reaction has caused opinions to be formed as to Miss Sullivan's morality which has made her unacceptable to a large portion of the public in and about Union Center and that such reputation of Miss Sullivan has made it extremely difficult for her to exert the proper authority and respect of her students and to obtain the necessary respect, communications and support of the public and parents which will be necessary to effectually carry out the school program.

> * * * * * *

> The personal life engaged in by Miss Sullivan and admitted by her constitutes a bad example for her students who are taught by example as well as by lecture. [387 F.Supp. at 1242–43.]

The Board's findings relative to incompetency boil down to three ultimate conclusions:

1) Ms. Sullivan's conduct set a "bad example" which prevents her from maintaining a proper moral environment.

2) Local and especially parental adult reaction to her conduct would preclude

---

7. *The Board made the following finding:*

A moral standard of the community of Union Center and its surrounding area as well as the rest of the rural area of the Meade Independent School District, is that two adult persons male and female, should not live together in the same fashion as husbands and wives do without being married and that to do otherwise constitutes gross immorality in the eyes of the vast majority of the public in said school district. [387 F.Supp. at 1242.]

her from generating necessary cooperation and support.

3) Student awareness that Ms. Sullivan's conduct was considered wrong by their parents and the community would impair her ability to maintain classroom discipline.

The Board was also clear that it was concerned only with the effect of Ms. Sullivan's conduct on her students in the peculiar circumstances of Union Center. The Board did not purport to find any general defect in her character, nor did the Board question her general abilities as a teacher. The parents who testified were in agreement that since Ms. Sullivan's arrival, their children's interest in school and rate of learning had markedly improved. Even Mr. Opstedahl, who circulated a petition calling for her removal, conceded that his daughter idolized Ms. Sullivan and seemed to be learning very well. Ms. Sullivan's overall superior performance is underlined by the Board's final decision which, despite significant public pressure for removal, offered to retain her if she would alter her living arrangements.

■ These facts raise very difficult constitutional issues. The Constitution affords a right of privacy, *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and a right of association with other persons for a variety of purposes. *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *DeJonge v. Oregon,* 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937). Ms. Sullivan did not seek to hide her relationship with Mr. Dragon, an impossibility while living in the community trailer court of Union Center, but neither did she flaunt it. She told the Board, in essence, that her decision to marry Dragon or to live with him without doing so was her personal business. There is no suggestion that she ever interjected these personal beliefs concerning this relationship into the classroom. Any knowledge of her conduct which her children possessed was simply the inevitable result of small town life.

On the other hand, the Board had before it evidence that Ms. Sullivan's conduct violated local mores, that her students were aware of this, and that, because of the size of the town, this awareness would continue. The Board considered the unrefuted testimony of a professional educator that teachers teach by example as well as by lecture. Ms. Sullivan was shown to have generated deep affection from her students, increasing the probability of emulation. Also, it was shown that because of the isolation of Union Center, students are required to leave home at age 14 to attend high school in Sturgis, some 60 miles away. Thus, local parents believe that early proper moral training for youngsters is particularly crucial in Union Center.

■ The Supreme Court has recognized that

[a] teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. [*Shelton v. Tucker,* 364 U.S. 479, 485, 81 S.Ct. 247, 250, 5 L.Ed.2d 231 (1960), *quoting Adler v. Board of Education,* 342 U.S. 485, 493, 72 S.Ct. 380, 96 L.Ed. 517 (1952).]

The courts have held that, within constitutional limits, the state is entitled to require teachers to maintain a "properly moral scholastic environment." *Andrews v. Drew Municipal Separate School District,* 507 F.2d 611, 614 (5th Cir. 1975); *cf. Moore v. Board of Education,* 448 F.2d 709, 714 (8th Cir. 1971). This reflects both an independent state interest in the well-being of youth and the state's interest in preserving the right of parents to control the upbringing of their children. *See Ginsberg v. New York,* 390 U.S. 629, 639–40, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); *cf. Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1971); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 401–03, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

■ None of these rights are absolute. When they come into conflict, a balance must be struck. In *Pickering v. Board*

*of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court was faced with a conflict between a teacher's right to "pure" political speech, which lies at the core of the first amendment, and the interests of a school board in regulating its schools.

To the extent that the Illinois Supreme Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court. *E.g., Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). "[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." *Keyishian v. Board of Regents, supra,* 385 U.S. at 605–606, 87 S.Ct. [675] at 685. At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. *The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. [Id.* at 568, 88 S.Ct. at 1734 (emphasis added).]*

■ Our resolution of these difficult issues is limited by the well established doctrine of judicial restraint. Federal courts do not "anticipate a question of constitutional law in advance of the necessity of deciding it" nor "decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Ashwander v. TVA,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *see Wood v. Strickland,* 420 U.S. 308, 314, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). We therefore carefully examine the issues to determine whether the difficult constitutional questions here presented must be resolved on this appeal.

Ms. Sullivan's primary claim is for compensatory and punitive damages.[8] Since the district court dismissed the claim against the school board as an entity, we are not faced with any pendent contract action, but only with a constitutional tort.[9]

■ We perceive no basis for a cause of action against defendants not members of the Board. Defendant-Wayne Davis, business manager of the school district, is not mentioned in the testimony in the court below. Defendant-Wayne Musilek, the rural principal with jurisdiction over Union Center Elementary School, merely consulted with Ms. Sullivan and reported to his superiors. Defendant-Kenneth Hague, superintendent of schools, only brought Ms. Sullivan's conduct to the attention of the

**8.** The case is in a peculiar posture on this point. Although the body of Ms. Sullivan's complaint alleges actual damages to future employment of $250,000, the *ad damnum* portion requests only punitive damages of $150,000 on each of two counts, plus injunctive relief and "such other and further relief as the court may deem appropriate." The complaint contains no allegation of malice or ill will which might justify punitive damages.

At the hearing, which the parties have treated as a trial on the merits, no evidence of actual damages was introduced with the possible exception of the employment contract itself. However, there is some suggestion of an agreement by the parties that the damage issue would be reopened if Ms. Sullivan were to prevail on the merits of her claim. Since the parties seem to assume that a claim for actual damages is before the court, we shall do likewise.

**9.** We note a possible state remedy for breach of contract may still be pursued by Ms. Sullivan against the Board as an entity in state court.

Board without recommendation and provided expert testimony on the probable effect of Ms. Sullivan's conduct on her students. Since none possessed a right to vote on the dismissal nor recommended dismissal, no claim exists against them. *Strickland v. Inlow,* 485 F.2d 186, 191 (8th Cir. 1973), *vacated on other grounds and remanded sub nom. Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

The Supreme Court has recently discussed the circumstances under which school board members may be held liable for damages in an action under § 1983. *Wood v. Strickland, supra.* The Court said that a board member

> must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the *basic, unquestioned constitutional rights of his charges.* * * * [A] school board member is not immune from liability for damages under § 1983 *if he knew or reasonably should have known* that the action he took within his sphere of official responsibility *would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury* to the student. *That is not to say that school board members are "charged with predicting the future course of constitutional law." Pierson v. Ray,* supra, 386 U.S. [[547], at 557, 87 S.Ct. [1213], at 1219, 18 L.Ed.2d 288 (1967).] A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith. [420 U.S. at 322, 95 S.Ct. at 1001 (emphasis supplied).]

While the Court's holding expressly applied only to the "specific context of school discipline," *id.,* its reasoning is equally valid with respect to a school board member's other official duties.

As our previous discussion indicated, the parameters of the newly evolving constitutional right to privacy are not yet clear. While the right of a couple to live together without benefit of matrimony eventually may be held to fall within the penumbra of the constitutional right to privacy, it had not been so held at the time the Board dismissed the appellant. Thus, it cannot be said that the members of the School Board either knew or reasonably should have known that their actions would violate a "constitutional right" of Ms. Sullivan. Further, even if the Constitution does afford Ms. Sullivan's lifestyle some protection, *Pickering v. United States, supra,* holds that the Board must balance the interests of the teacher against its own legitimate governmental interests.

Since the particular privacy right asserted by Ms. Sullivan is not unquestioned, we need not consider whether the Board failed to apply the balancing test of *Pickering* in good faith in order to resolve the claim for damages. However, we must consider whether the Board afforded Ms. Sullivan her basic and unquestioned right to procedural and substantive due process. *See Wood v. Strickland, supra,* on remand sub nom., *Strickland v. Inlow,* 519 F.2d 744 (8th Cir. 1975); *Fisher v. Snyder,* 476 F.2d 375 (8th Cir. 1973).

The procedures followed by the Board in this case cannot be faulted. In *Strickland v. Inlow, supra,* we held that basic due process requires notice and an opportunity to be heard. 519 F.2d at 746. In this case, the Board went far beyond that fundamental minimum. The Board's care to respect Ms. Sullivan's procedural right would also go far to dispel any suspicion of an impermissible motivation by the members of the Board, had Ms. Sullivan made such an allegation.

The record shows that when school officials became aware of Ms. Sullivan's conduct they contacted her, asked about the facts, and suggested a compromise solution. When this was rejected, the Board gave Ms. Sullivan written notice of the charges and of the time and place of the hearing. The Board attempted to

avoid adverse publicity which might prejudice the case.[10]

Counsel represented Ms. Sullivan throughout the proceedings. Once she retained counsel, the Board dealt directly with him. The Board also had the advice of its own counsel from the earliest stages. The witnesses who testified (some in support of the dismissal, others against it) were examined and cross-examined by counsel. The Board also participated in the questioning in an orderly manner.

Ms. Sullivan was allowed to testify personally. She was examined by both counsel and by the Board. Her refusal to discuss the details of her relationship with Don Dragon was honored despite the apparent unavailability of any fifth amendment privilege against self-incrimination.

After receiving all of the evidence, the Board permitted counsel to make closing statements and to submit briefs. With the advice of counsel, the Board prepared written findings. Despite being advised by counsel that Ms. Sullivan's conduct justified her discharge, the Board on its own initiative decided to make one last effort to persuade her to change her living arrangement. Only after that effort failed did the Board dismiss her.

The primary factual question before the Board was whether Ms. Sullivan's conduct was likely to affect her students. Several parents testified that their children admired and respected her and were likely to regard her as a role model. Dr. Hague presented expert testimony that emulation was likely. In addition to his own opinion, he was permit- ted without objection to quote from numerous published sources. Also, by virtue of their position and experience, the members of the Board should be presumed to have some independent knowledge and understanding in this area. Indeed, it appears that at least one member of the Board, Mrs. Shirley Massa, was a qualified expert on education in her own right.[11] Her testimony before the district court concerning her reasons for voting for dismissal is excerpted below:

I feel it is a very important, a very important thing not only the contents that you teach children, but the example—perhaps the most learning or the best learning that you do is not done by words.

And right now we are living in a society where kids are having a pretty rough time. * * * Miss Sullivan is an adult who is 26 years old and who should be able to handle her own life, but she is being—she is relating to the children * * * in the school and in the community that look up to her and who like her. * * * [A] teacher that is a liked teacher * * *, she is your ideal, and you identify with her. It's a very difficult thing when you have an example of someone you think a great deal of and when you are faced with a problem of your own, say, for instance, a youngster * *. I think all young people, particularly young girls, like to have a young friend * * *.

How are they going to handle their own lives? If these kids are going to be going into a larger school there is

10. The fact that the Board received a petition requesting Ms. Sullivan's removal demonstrates that this effort was not wholly successful. However, some of the publicity may have been generated by Ms. Sullivan's actions. During the testimony of Dr. Hague, he stated that he had attempted to handle the matter confidentially but "[Ms. Sullivan is] the one that opened it up, isn't that correct?" Ms. Sullivan replied, "That's correct, I have." However, we must also observe that Ronald Opstedahl, one of the parents, greatly stirred up the local community by circulating a petition calling for Ms. Sullivan's removal. Opstedahl's daughter attended Ms. Sullivan's class. It was he who initiated the complaint about Ms. Sullivan's conduct with school authorities. His action seems to have been religiously motivated. He was assisted in circulating the petition by his minister and several fellow church members.

11. Mrs. Massa's undergraduate degree is in education, psychology, and social science Her masters is in social science, guidance, and counseling. She has done additional academic work in guidance and counseling. Mrs. Massa has taught educational psychology at the college level and has conducted both group and individual counseling.

going to be a lot of people. Sturgis isn't that large, but to people from Union Center it's a lot bigger. [When youngsters from Union Center have to go to Sturgis to attend high school at age 14 and are faced with a difficult situation, they may feel] they say it was all right for my friend. She has a college education. She has a job and has all the things I would like to be and to do.

\* \* \* \* \* \*

If she had been living in Rapid City [a larger town] under these circumstances \* \* \* it would have made a difference how she would have related to her students at Union Center.

\* \* \* \* \* \*

I don't happen to believe that just what you teach in the school room is all education. Education is mostly— most education is not by teaching from books or words. The ideal education is by example, is by what—by what you see \* \* \* someone do. It's the examples that you have.

\* \* \* \* \* \*

[T]here was \* \* \* a great deal of hope as far as the board was concerned that they could come to some kind of agreement with Miss Sullivan. \* \* \* [W]e all felt very, very badly. I think we all tried and worked at it very hard and searched our conscience very much.

I remember one member of the board saying to me afterwards, "This was the most difficult decision I ever made in my life."

 Thus, there was some basis for the Board's concern that Ms. Sullivan's conduct might have an adverse effect on her students in the future. A Board's "mere mistake in judgment or in weighing the evidence does not demonstrate any violation of substantive due proc-

ess." *Scheelhaase v. Woodbury Central Community School District,* 488 F.2d 237, 245 (8th Cir. 1973) (Bright, J., concurring); *cf. Wood v. Strickland, supra,* 420 U.S. at 308, 95 S.Ct. 992, 43 L.Ed.2d 214. The record as a whole convinces us that the Board acted in good faith toward Ms. Sullivan. Thus, no damages could be awarded against the Board regardless of the ultimate validity of Ms. Sullivan's asserted constitutional right to live with Mr. Dragon in a nonmarital status.[12]

Ms. Sullivan's complaint also sought injunctive relief ordering her reinstatement. However, at oral argument, in response to inquiry by the court, Ms. Sullivan's counsel stated that she had returned to new York and that

> \* \* \* I do have her authorization to state that she would not seek reinstatement of the teaching position.

The Supreme Court has indicated that federal courts should "fully \* \* \* accept [such] representations \* \* \* as parameters for decision." *DeFunis v. Odegaard,* 416 U.S. 312, 317, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974) (*per curiam* ).

Since the request for reinstatement has been withdrawn, we do not reach the underlying constitutional issues. No other form of relief has been requested in this proceeding and we are persuaded that none would be appropriate. Therefore, any further discussion of the constitutional issues is unnecessary. Even assuming that Ms. Sullivan is constitutionally entitled to follow her own lifestyle, the record clearly and unequivocally demonstrates that the members of the school board acted in complete good faith and with concern for Ms. Sullivan's constitutional rights. Thus, they cannot be held liable for damages.

For the reasons stated in this opinion, we affirm the district court's dismissal of the action against all appellees. In light of the opinion, however, we remand

---

**12.** A similar analysis precludes granting damages on the theory that the statute is impermissibly vague. *Pierson v. Ray, supra,* 386 U.S. at 554, 87 S.Ct. 1213. The Supreme Court has held that nonpenal delegations of discretion may be couched in broad language.

*Arnett v. Kennedy,* 416 U.S. 134, 159, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). Because of the Board's repeated warnings that Ms. Sullivan's conduct would lead to dismissal if not altered, she does not seriously claim lack of notice.

this case to the district court with directions to modify its judgment to reflect a dismissal of the action for failure of Ms. Sullivan to establish a claim for damages against the appellees. Such modification of the judgment may serve to avoid or lessen any stigma which might otherwise attach to Ms. Sullivan's teaching record.