Henry OHLAND

v.

**CITY OF MONTPELIER, and the follow-
ing named Individuals in their official
capacity cited herein and as Individuals,
Arthur McLellan, Police Chief, City of
Montpelier, Roland Dubay, City Mana-
ger, City of Montpelier.**

Civ. A. No. 75–167.

United States District Court,
D. Vermont.

Feb. 26, 1979.

John A. Burgess, Burgess & Normand, Montpelier, Vt., for plaintiff.

W. Edson McKee, McKee, Giuliani & Cleveland, Montpelier, Vt., for defendants.

## OPINION AND ORDER

COFFRIN, District Judge.

In this action the plaintiff seeks money damages against the City of Montpelier, its police chief and city manager. The plaintiff alleges that rights guaranteed to him by the first and fourteenth amendments to the Constitution were violated by his discharge as a policeman on March 29, 1974. Plaintiff brought his claim against the individual defendants under 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343. His direct constitutional claim against the city was brought under the general federal question statute. 28 U.S.C. § 1331. Before addressing the issues and arriving at its decision the court deems a chronological review of the proceedings will be helpful because of the length of time the case has been under advisement following trial on the merits and because of the manner in which the parties have chosen to raise the various issues presented.

### I. Procedural History of the Case

Plaintiff filed his complaint on July 2, 1975, and the defendants answered on July 17, 1975. Plaintiff moved for summary judgment under Fed.R.Civ.P. 56(c) on August 11, 1975 arguing that since defendants admitted discharging plaintiff without a hearing after he had served for eleven months there was no genuine issue of material fact. He contended that defendants' failure to provide him a hearing violated his fourteenth amendment due process rights, because the City Charter set the probationary period for policemen at six months. On March 26, 1976 the City of Montpelier moved to dismiss the action "since this is a civil rights action and such action does not lie against a municipality." The defendants also raised an alternative defense, claiming that plaintiff had been a probationary employee when discharged, because he was hired pursuant to the city's Personnel Plan, which provided that classified employees could be hired on a probationary status for up to twelve months. Plaintiff's motion for summary judgment and defendants' motion to amend answer were denied following argument at a hearing on March 30, 1976. Counsel for the parties jointly prepared a proposed pre-trial conference order and presented it to the court on April 26, 1976 for consideration; counsel waived a pre-trial conference scheduled for May 3, 1976. The court accepted the proposal as the pre-trial conference order in the case and it was filed on August 11, 1976. The order limited the issues of fact for determination by the court to:

A. Was the plaintiff employed as a regular police officer;

B. Was the plaintiff discharged as a result of the exercise of his rights under the first amendment to organize a union and to voice opinions; and

C. What damages, if any, is the plaintiff entitled to?

The issues of law were stated to be:

A. Whether a municipal corporation is amenable to federal jurisdiction for violation of constitutional rights pursuant to 28 U.S.C. § 1331(a);

B. Whether the acts of the individual defendants are actionable under 42 U.S.C. § 1983; and

C. Whether res judicata or collateral estoppel bars the plaintiff from raising his claims in this action.[1]

On September 28, 1976, after the pre-trial order was filed, the defendants moved to dismiss the action for lack of jurisdiction, claiming that the Supreme Court's ruling in *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), barred this court's consideration of plaintiff's employment status. By written order and opinion filed February 10, 1977 we denied this motion but granted the City of Montpelier's motion to dismiss the action as to it. The court relied on the holdings in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and *Mitchell v. Libby*, 409 F.Supp. 1098 (D.Vt.1976), that a cause of action against a municipality for damages due to a

1. Stated in the pre-trial order as: "Does res judicata govern some of the issues?"

constitutional violation did not lie either under 42 U.S.C. § 1983 or directly under the Constitution and 28 U.S.C. § 1331. At that time the court also held that the decision of the Vermont Supreme Court in *Ohland v. Dubay*, 133 Vt. 300, 336 A.2d 203 (1975), did not bar us from determining whether plaintiff was a probationary employee or whether he had a cognizable property interest in continued employment.

By order of January 27, 1977, the court allowed amendments to plaintiff's complaint and defendants' answer requesting an award of attorney's fees to the prevailing party pursuant to 42 U.S.C. § 1988.

On February 17, 1977 the plaintiff filed a motion in which he sought to have the court amend its order dismissing the City of Montpelier to enable him to take an immediate appeal therefrom pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5. This motion was denied on March 9, 1977 for reasons stated in a written opinion.

Trial commenced by court on March 15, 1977 and the taking of evidence was completed that day. The court granted leave for the parties to take and file the deposition of defendant McLellan who was ill, and deferred hearing evidence on the question of damages to a date subsequent to the filing of the McLellan deposition. On July 6, 1977 this deposition was filed and the court received evidence on the question of damages. Decision on the merits was reserved at the conclusion of the trial and the parties subsequently filed requests for findings and post-trial memoranda as requested by the court.

In the interval between the commencement and conclusion of the taking of evidence, defendants McLellan and Dubay filed a motion requesting the court to reconsider its February 10, 1977 holding that plaintiff had been a regular employee of the city with a continued expectation of employment. Defendants advanced the argument that in *Ohland v. Dubay*, 133 Vt. 300, 336 A.2d 203 (1975), "the following issues were litigated:

(1) Dismissal for union activity.

(2) Dismissal for activities in bringing about an investigation of the Police Department.

(3) That the dismissal was for inability to perform routine police work in a competent fashion."

Motion to Reconsider and Memorandum in Support of Defendants' Motion Concerning *Res Judicata*, filed March 23, 1977. Defendants asserted that evidence with respect to those allegations should not have been received in the instant action under principles of res judicata and collateral estoppel. A discussion of these claims will follow below.

On November 3, 1977, with the case still under advisement, the plaintiff filed a motion to reinstate the City of Montpelier as a party defendant, following the Second Circuit's decision in *Gentile v. Wallen*, 562 F.2d 193 (2d Cir. 1977), holding that a complaint setting forth a denial of due process by a municipal corporation stated a cause of action directly under the fourteenth amendment. We withheld decision on this motion pending the *en banc* decision of the Second Circuit in *Turpin v. Mailet*, 579 F.2d 152 (2d Cir. 1978), which was expected to address the same question. *Turpin* was decided on June 5, 1978. A divided court held that a damage action could be maintained against a municipality to redress injuries resulting from the actions of its employees that have been authorized, sanctioned or ratified by municipal officials or bodies functioning at a policy-making level. The following day, June 6, 1978, the United States Supreme Court decided the case of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which held that local governments were "persons" to whom the provisions of 42 U.S.C. § 1983 apply.

On June 19, 1978 the court met with counsel and requested additional memoranda of law concerning the effect of *Turpin* and *Monell* on the present case. On June 28, 1978 the parties stipulated to the reinstatement of the City of Montpelier as a party defendant. Based thereon, it is now so ordered. In the same stipulation the

parties agreed that "[f]or all purposes, including that of determining the liability of the City of Montpelier, this action may be submitted to the Court on the basis of the facts which are already of record, and further taking of evidence being waived by all parties." The court now undertakes an examination of those facts.

## II. *Findings of Fact*

On April 15, 1973, the individual defendants, acting jointly and severally in their official capacities and as representatives of the City of Montpelier, hired plaintiff as a police officer. At the time he was hired, plaintiff was advised that he would be on the "usual" probationary status. It is unclear what the parties had in mind at that time with regard to the period or terms of probation but it is likely that no specific consideration was given to either.

At that time the Montpelier City Charter provided for a six-month probationary period for newly-appointed regular police officers, during which period the chief of police could summarily revoke an appointment. Thereafter an officer could be discharged only for incompetence, neglect of duty or misconduct, and would be entitled to a hearing on those charges before the city council.

The City of Montpelier had also adopted a personnel policy pursuant to a legislative grant of authority, Vt.Stat.Ann. tit. 24, §§ 1121–22 (1975), which policy was in effect at the time plaintiff was hired. Section 2–703 of that Personnel Plan reads:

All appointments of classified employees shall be, in the first instance, made for a minimum probationary period of six months and a maximum period of twelve months. The determination of length of probationary period is to be made by the department head when employing applicants and made a permanent record within the employee's personnel file.

Any employee may be discharged from duty during his probationary period by the department head without the benefit of notice or hearing as provided in Sec. 2–720.

No evidence indicates whether defendant McLellan, the head of the police department, made the required permanent record of the length of plaintiff's probationary period in plaintiff's personnel file at the time of hiring.[2] Ohland later understood from conversations with other police officers that the probationary term was customarily twelve months.

Prior to being hired by the City of Montpelier, plaintiff had worked for five years for the Nassau County, New York, police department as a patrolman and acting detective. During that period he was a member of an organized policemen's association. When he was hired in Montpelier there was no employee's organization of any type in the Montpelier Police Department.

During the spring and summer of 1973 discussions arose among Montpelier police officers, including the plaintiff, about forming a Police Benevolent Association (PBA).[3] On September 20, 1973 department members of the rank of sergeant or below agreed to form such an association. Although he initially declined the nomination, plaintiff became the organization's first president on October 4, 1973.

Prior to his election as president, plaintiff, Sergeants Rock and Graham and Captain Roya met with defendant McLellan. Defendant Dubay was not present. McLellan referred to the PBA as a union and warned the participants to "watch it" and "go very, very carefully." McLellan nevertheless provided the members of the department with the opportunity to form the organization by furnishing a meeting room and allowing time for meetings during working hours.

---

**2.** Defendant Dubay, the only witness of whom inquiry was made with respect to plaintiff's personnel file, testified that he had never examined it.

**3.** Plaintiff testified that a PBA is a collective bargaining unit with characteristics of both a fraternal organization and a union.

During the period when the PBA was being organized plaintiff and other representatives of the police department met with defendant Dubay in his capacity as city manager to discuss complaints that the officers had about the operation of the department. In addition to a number of minor issues, they discussed the possible discharge of Chief McLellan by defendant Dubay.[4] McLellan's attitude was that he was not going to let a "politician get him." The PBA backed Chief McLellan but sought better organization of the department.

Plaintiff and Michael O'Neill, a member of the police force who testified as a witness for plaintiff, stated that at a meeting with defendant Dubay in early October, 1973, at which the PBA was discussed, Dubay advised that the members of the police department could have a union but he would fight it every way "not legal."[5] Ohland testified that, at a meeting held later the same week, defendant Dubay stated to the officers present that if the union caused any difficulties "you will be down the road." Ohland also testified that Dubay had had difficulties with police unions in other municipalities and that Dubay stated that he had a reputation as a "union buster." Both Dubay and Captain Roya, who attended the meetings, denied that there had been any anti-union threats made by Dubay or that he had even stated or implied he was a "union buster." Dubay did indicate in a conversation with plaintiff that although he had no objection to the PBA, he was a little concerned with it in the first instance and later believed it was leading to the organization of a union.

In February, 1974 the PBA became affiliated with the American Federation of State, County and Municipal Employees, AFL–CIO (AFSCME). Plaintiff remained active in the PBA until his discharge and had further meetings with both Dubay and McLellan about union matters following the affiliation with AFSCME. From the date of plaintiff's election as president of the PBA until his discharge, however, McLellan never said anything about plaintiff's involvement with the union affecting his employment status. Ohland did testify that on two, possibly three, occasions McLellan told him that Dubay was looking for reasons to fire plaintiff.

As a police officer plaintiff had a mixed record. His performance of routine matters such as traffic control and the answering of non-criminal complaints was not satisfactory. He did his best work in the area of criminal and narcotics investigations. McLellan, who was in close contact with plaintiff, was aware of the manner in which Ohland performed his duties but Dubay, who did not see plaintiff frequently, testified he had no complaint with plaintiff's work. Controversy existed in the Montpelier Police Department in late March, 1974. Although the exact nature of the problem is not clear from the evidence, there was testimony indicating that the department was generally badly managed and disorganized. The city council was sufficiently concerned about the situation that on two separate occasions it appointed citizens committees to review the department's operations. Prior to this time there had been newspaper publicity about PBA meetings; and on at least one occasion plaintiff had talked to a reporter from the local newspaper, the Montpelier *Times-Argus,* about conditions in the police department.

On March 25, 1974 defendant McLellan requested and received a letter from the city attorney, which in its entirety read:

March 25, 1974

Arthur McLellan, Chief of Police
City Hall
Montpelier, Vermont 05602
Dear Chief McLellan:

You have requested my opinion concerning your right to discharge a probationary patrolman and whether or not it would be an unfair labor practice under Municipal Labor Relations.

Article VII entitled City Employees Personel [sic] Plan § 2–703 gives you the

---

4. Plaintiff testified that this occurred in November, 1974, which would be after his discharge. He probably intended to say 1973.

5. In testifying, plaintiff used the words "not legal." It is possible he meant to say "not illegal."

privilege to discharge any person during his probationary period without notice or hearing as provided in § 2–720. It would appear that under the Municipal Labor Relations Act that a person on probationary status is not a municipal employee and it would be my opinion that such a discharge would not violate the Act.

Very truly yours,

s/ W. Edson McKee

W. Edson McKee

City Attorney

wem/ll

c.c. Roland Dubay, City Manager [6]

On March 28, 1974 plaintiff received a letter from defendant McLellan which stated:

This department has made an evaluation of your progress during your probationary period and concluded that you do not meet the standards of this department. Your services are terminated as of March 29, 1974.[7]

At the time of his discharge the plaintiff was not given a hearing or a statement of reasons for his discharge.

Defendant McLellan testified that plaintiff was discharged because he was "still a probationary patrolman [and] I wasn't satisfied with his work as a patrolman." He also testified that he had spoken with plaintiff about his dissatisfaction before the discharge and that Ohland's union activities had nothing to do with his discharge. Ohland on the other hand testified that McLellan told him he had been fired for union activities "but he would deny it in court."

Defendant Dubay did not instruct McLellan to discharge Ohland nor did McLellan consult with Dubay before doing so. The city manager first had notice of the discharge when he received a copy of Ohland's termination letter. The court notes, however, that the city attorney's letter of March 25, 1974 to McLellan bears a notation that a copy had gone to Dubay.

Following his discharge plaintiff and the union filed an unfair labor practice charge against defendants Dubay and McLellan with the Vermont State Labor Relations Board (the Board) pursuant to the Vermont Municipal Labor Relations Act, Vt.Stat. Ann. tit. 21, Ch. 22 (1975). After a hearing, the Board made Findings of Fact and Conclusions of Law and dismissed the complaint based thereon. The Vermont Supreme Court sustained the holding of the Board on appeal. *Ohland v. Dubay,* 133 Vt. 300, 336 A.2d 203 (1975).

At some point in this history, the exact time not appearing, plaintiff secretly taped a conversation he had with defendant Dubay. In the course of that interview, a query from Ohland as to the real reason he was fired precipitated a response from Dubay "right off the top of my head and straight from shoulders, . . . Why the hell didn't you keep your mouth shut for a year?" [8] Dubay also stated that Ohland's discharge was the result of many factors, but primarily his attitude.[9]

Following his discharge on March 29, 1974, plaintiff was unemployed until September 5, 1975. During the period of unemployment he made 187 job applications for positions both in and out of police work. Also during this period of time he was recuperating for a period of approximately three months from a broken leg sustained in a snowmobile accident which occurred around Thanksgiving, 1974. On September 5, 1975 plaintiff finally secured employment with the Burlington Police Department, and he remained there until February 4, 1976, when he voluntarily quit in anticipation of

---

6. Defendants' Exhibit B.

7. Defendants' Exhibit A.

8. Transcript of interview at 4.

9. Transcript of interview at 10 and 12. Conflicting inferences might well be drawn from statements made by Mr. Dubay during the taped conversation. Because, as discussed in the text below, this court is bound by the conclusions of the Vermont courts as to the reasons for Mr. Ohland's discharge, it is unnecessary to weigh those possible inferences. We are satisfied that the state tribunals considered the factual issues underlying the constitutional claims made here when deciding that Mr. Ohland was discharged for cause.

securing employment with the Barre Police Department. In July 1976, after the Barre job did not materialize, he opened his own business and from that time forward his financial situation has been "recovering."

At the time of his discharge plaintiff's pay was $144.90 a week. After losing his job, he was unemployed for a period of 75 weeks. For approximately 13 of those 75 weeks plaintiff was recovering from the effects of his broken leg. Nothing in the record indicates that this period of convalescence detracted in any way from his ability to obtain work or that he was less able to obtain work during this period than at other times during his unemployment.

When plaintiff finally went to work for the Burlington Police Department he was paid $121 a week, or $23 less than he was receiving from the City of Montpelier at the time of his discharge. The loss he sustained for the 22-week period that he worked in Burlington was $525.80. Inasmuch as the plaintiff voluntarily severed his Burlington employment, he suffered no loss of income from that point forward as the result of his discharge by the defendants. Therefore, his total loss of income due to his job termination was $10,867.50 plus $525.80, or $11,393.30.

The evidence does not support the award of any additional damages for emotional distress. After the loss of his job, the plaintiff became upset and experienced some emotional difficulty. Following his discharge, he verbalized some thoughts about killing himself, his relationship with his wife deteriorated, he exhausted $3,000 which he had received from an insurance settlement, and his family was dependent upon welfare for a period of time. The plaintiff did not seek medical treatment for these emotional difficulties although his counsel arranged an appointment for him and his wife with Dr. Peter H. LeQueur, a psychiatrist associated with the Vermont State Hospital. As the result of an interview held on May 12, 1975 which lasted approximately one and a half hours, Dr.

LeQueur formed the judgment that prior to his discharge the plaintiff and his wife were cheerful, pleasant people who got along reasonably well. Ohland was inclined to push his wife around somewhat but did not beat her. He was also a good and fair father although his wife thought he was away from home too much. After the loss of his job, the plaintiff became irritable toward his wife and despondent about life in general. He suffered from a loss of dignity and self-worth and made comments about self-destruction a number of times to his wife. As a result Dr. LeQueur concluded at the time of the interview that the plaintiff had endured a feeling of life without dignity for 14 months and that his discharge was a contributing factor to that state. Other contributing causes, according to Dr. LeQueur, were plaintiff's broken leg, a gall bladder attack and difficulties associated with the collapse of his house sometime prior to the loss of his job.

The loss of his job was upsetting and caused the plaintiff emotional difficulty but it is impossible to find, and accordingly the court does not, that his emotional problems were any greater or different than those associated with the loss of employment by most individuals who find themselves suddenly without a job regardless of the cause. The court does not find that plaintiff's emotional difficulty was directly attributable to any intentional, malicious or unlawful acts on the part of the defendants.

 The court has also considered plaintiff's claims for damages arising specifically from his being deprived of procedural due process rights in the manner of his termination. Because plaintiff would have been discharged for cause even if he had been given notice and a hearing before the city council, he has suffered no independent harm due to the city's failure to follow those procedures. In addition, since at the time of his discharge he did not believe that the city's procedures were deficient, we cannot find that he suffered any mental distress as a result of the denial of procedural due process itself.[10] We conclude,

---

10. Although some courts have awarded damages for lost wages under the theory of "constructive reinstatement" even where an employee discharged without a proper hearing

therefore, that if plaintiff were entitled to recover damages from the defendants for the deprivation of due process, he would be entitled to recover nominal damages only. However, for the reasons discussed below, the court holds that the defendants are not answerable in damages under any of the theories of liability advanced by the plaintiff in this action.

### III. Collateral Estoppel Effect of State Proceedings

■ Defendants in this action have affirmatively asserted the defense of res judicata.[11] The defense, however, is more properly one of collateral estoppel,[12] or estoppel by verdict as it is generally called in Vermont.[13] The defense is claimed to arise from the findings and conclusions of the Vermont State Labor Relations Board and the Vermont Supreme Court concerning the plaintiff's employment status at the time of his discharge and the reasons for that discharge. The focus of the state court litigation on this matter was whether the discharge constituted an unfair labor practice under Vt.Stat.Ann. tit. 21, § 1726 (1978). In the instant proceeding the issue is whether the discharge violated the plaintiff's constitutional rights. Our examination of the record of the state proceedings reveals nothing from which we could even infer that the constitutional issues were either raised or decided in those proceedings. It is therefore apparent that res judicata will not bar this court's consideration of the constitutional claims. *Ornstein v. Regan,* 574 F.2d 115 (2d Cir. 1978); *Winters v. Lavine,* 574 F.2d 46 (2d Cir. 1978); *Ellentuck v. Klein,* 570 F.2d 414 (2d Cir. 1978);

was later found to have been discharged for cause, *see, e. g., Horton v. Orange County Board of Education,* 464 F.2d 536 (4th Cir. 1972), the Supreme Court has explicitly disapproved of that theory. *Carey v. Piphus,* 435 U.S. 247, 260 n.15, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). *Carey* teaches that in order to recover more than nominal damages for the deprivation of procedural rights in a job termination, a plaintiff must prove that the procedure itself caused some compensable harm independent of the losses due to the underlying termination. The plaintiff herein has made no such showing. As discussed in the text below, the Vermont courts have found that plaintiff was discharged for cause, and this finding is binding in the present action. It follows that his subsequent loss of income was not the result of the city's failure to give him notice and a hearing before his discharge. *Carey* also holds that one whose procedural due process rights have been violated cannot recover for mental distress unless he actually knew that the procedures were irregular and this knowledge caused mental and emotional harm. 435 U.S. at 263, 98 S.Ct. 1042. The plaintiff admits, and the Vermont Supreme Court has found, *Ohland v. Dubay,* 133 Vt. 300, 303, 336 A.2d 203 (1975), that at the time of his discharge plaintiff did not think he was a regular employee entitled to the procedural protections set out in the Montpelier City Charter.

11. Res judicata denotes that a valid, final judgment, when rendered on the merits, is an absolute bar between the same parties or those in privity with them, upon the same claim or demand. 1B Moore's Federal Practice ‟ 0.405[1] (2d ed. 1974).

12. Collateral estoppel denotes that a judgment constitutes an estoppel between the same parties or those in privity with them as to issues that were necessarily litigated and determined although the claim or demand in the subsequent action is different. 1B Moore's Federal Practice ¶ 0.441[1]–[2] (2d ed. 1974).

13. Estoppel by verdict is a component of the doctrine of res judicata. The distinction between a former judgment as a bar to a subsequent action under a plea of res judicata, and an estoppel by verdict or findings is set forth in *Fletcher v. Perry,* 104 Vt. 229, 231–32, 158 A. 679 (1932). The rule under the latter theory was stated in *Gilman v. Gilman,* 115 Vt. 49, 52, 51 A.2d 46, 48 (1947), as follows:

[W]hen some controlling fact or question material to the determination of both suits has been adjudicated by a court of competent jurisdiction and is again at issue between the same parties, or some of them, the former adjudication will, if properly presented, be conclusive of the same fact or question in the second suit, although the two suits are not for the same cause of action.

*Citing Fletcher v. Perry,* 104 Vt. 229, 158 A. 679 (1932); *Spaulding, Admr. v. Mutual Life Ins. Co. of N. Y.,* 96 Vt. 67, 117 A. 376 (1922); *Blondin v. Brooks,* 83 Vt. 472, 76 A. 184 (1910). The point decided must have been essential to the former judgment, one which must necessarily have been decided in order to support the judgment. *Turner v. Bragg,* 117 Vt. 9, 83 A.2d 511 (1951); *Trapeni v. Walker,* 120 Vt. 510, 144 A.2d 831 (1958).

*Turco v. Monroe County Bar Ass'n,* 554 F.2d 515 (2d Cir.), *cert. denied,* 434 U.S. 834, 98 S.Ct. 122, 54 L.Ed.2d 95 (1977); *Newman v. Board of Education,* 508 F.2d 277 (2d Cir.), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1447, 43 L.Ed.2d 762 (1975); *Lombard v. Board of Education,* 502 F.2d 631 (2d Cir. 1974), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975); *Thistlewaite v. City of New York,* 497 F.2d 339 (2d Cir.), *cert. denied,* 419 U.S. 1093, 95 S.Ct. 686, 42 L.Ed.2d 686 (1974).

This general conclusion, however, does not resolve the question of whether this court is bound by the specific findings of the Vermont State Labor Relations Board as to whether the plaintiff was a probationary employee at the time of his discharge and whether he was discharged for union activities or for the unsatisfactory performance of his duties. The Board ruled that the plaintiff was on a probationary status at the time of his discharge and that he was properly discharged for failure to perform his regular duties satisfactorily. Defendants' position is that these findings have collateral estoppel effect in the present litigation and are determinative of the plaintiff's constitutional claims—that is, because plaintiff was a probationary employee, he had no due process right to notice and hearing on his termination; and because he was fired for good cause, he could not have been fired for the exercise of protected first amendment rights.

Upon review of the record of the Board's hearings, appropriate Vermont law, the Printed Case before the Vermont Supreme Court, and upon thorough consideration of the cases dealing with the collateral estoppel effect of state administrative determinations, we reject the argument that this court is estopped from making an independent review of any issue decided by the Board. We are convinced, however, that the Vermont Supreme Court's determination in this case stands in a different posture and precludes our examination of those issues that were fully and fairly litigated in that forum, concluded by a final judgment, and the determination of which was necessary to the judgment rendered. These conclusions require us to dismiss the first amendment claim and to consider the due process claim on its merits.

■ 28 U.S.C. § 1738 [14] requires federal courts to give full faith and credit to judgments entered by state courts of competent jurisdiction. A federal court must accord a prior judgment of a state court the same conclusive effect that res judicata considerations would have required it to be given within the state. *Winters,* 574 F.2d at 54; *Mitchell v. National Broadcasting Co.,* 553 F.2d 265 (2d Cir. 1977); *McCune v. Frank,* 521 F.2d 1152, 1155–57 (2d Cir. 1975); *American Mannex Corp. v. Rozands,* 462 F.2d 688 (5th Cir.), *cert. denied,* 409 U.S. 1040, 34 L.Ed.2d 489 (1972). Section 1738 also requires in appropriate circumstances that a federal court apply the state court's standards of collateral estoppel. *Winters,* 574 F.2d at 54; *American Mannex Corp.,* 462 F.2d at 690; *United States v. Silliman,* 167 F.2d 607, 620–21 (3d Cir.), *cert. denied,* 335 U.S. 825, 69 S.Ct. 48, 93 L.Ed. 379 (1948); 1B *Moore's Federal Practice* ¶ 0.406 at 902 n.4 (2d ed. 1974); *Developments in the Law—Section 1983 and Federalism,* 90 Harv.L.Rev. 1133, 1138 n.37 (1977).

Although the Second Circuit decisions have not always been consistent on this issue, the rule regarding collateral estoppel

14. 28 U.S.C. § 1738 reads as follows:

The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto.

The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.

Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

in federal civil rights lawsuits in this circuit has recently been restated by the court of appeals:

[A] litigant in federal court is precluded from relitigating issues which were litigated and determined adversely to him in the prior court proceeding, but "for the doctrine of issue preclusion [i. e., collateral estoppel] to be applicable, the determination of the issue must have been necessary to the [prior] decision."

*Winters v. Lavine*, 574 F.2d 46, 57 (2d Cir. 1978) (quoting *Lombard v. Board of Education*, 502 F.2d 631, 637 (2d Cir. 1974)) (additional citation omitted). The doctrine of collateral estoppel expressed in *Winters* is in accord with the Vermont rule of estoppel by verdict;[15] therefore, it is unnecessary for the court to determine whether "general" federal res judicata doctrine or Vermont collateral estoppel doctrine applies in this case. *See id.* at 55.

■ Some support can be found for the proposition that the findings of fact and conclusions of law of state administrative agencies should be given collateral estoppel effect in subsequent federal court proceedings. *Mitchell v. National Broadcasting Co.*, 553 F.2d 265 (2d Cir. 1977). *Cf. United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). However, this is not a rule to be applied mechanically. The degree of deference accorded to state administrative rulings in subsequent federal civil rights actions is a function of several factors, including the thoroughness of the prior proceeding, the procedural protections employed, whether the parties were represented by counsel, whether the ruling was one of law or fact, and whether the ruling was upheld on appeal in the state courts. *See Mitchell*, 553 F.2d at 269; *Whitman Electric, Inc. v. Local 368, IBEW*, 398 F.Supp. 1218 (S.D.N.Y.1974).

■ The first matter for consideration is the Vermont State Labor Relations Board's finding that plaintiff was discharged because of his unsatisfactory performance of routine police duties, and not because of his membership in, leadership of, or advocacy on behalf of the Police Benevolent Association, nor because of his public criticism of the administration of the police department. On appeal the Vermont Supreme Court upheld this conclusion as being "supported by credible evidence and legitimate inferences which fall within the Board's special province . . . ." *Ohland v. Dubay*, 133 Vt. 300, 303, 336 A.2d 203, 205 (1975). The Board and the supreme court both determined that plaintiff's dismissal was not a violation of rights protected by the Municipal Labor Relations Act, Vt.Stat.Ann. tit. 21, §§ 1721–1735 (1978). Such a conclusion would not necessarily bar a § 1983 action based on first amendment grounds, because the statutory definition of unfair labor practices might not cover the full range of expression protected by the first amendment. The state court's opinion in *Ohland*, however, is determinative of the constitutional claim in the present case because the statutory claim argued in the state proceedings and the constitutional claim presented here are based on the same facts. Plaintiff's union-related activity would be protected in either case,[16] and plaintiff alleges no other imper-

15. See note 13, supra.

16. Three alleged violations of the Municipal Labor Relations Act, Vt.Stat.Ann. tit. 21, § 1726(a)(1), (3), and (4), were at issue before the Vermont State Labor Relations Board; an affirmative finding as to any one of them would have amounted to a finding of an unfair labor practice. Noting that the heart of any employment discharge linked with anti-union discrimination is the question of employer motivation, the Vermont Supreme Court cited three guidelines helpful in examining the question. These are "whether the employer knew of the employee's activity in the union, whether there was a climate of coercion, and whether the timing of discharge was suspect." *Ohland v. Dubay*, 133 Vt. 300, 302–03, 336 A.2d 203, 205 (1975). The opinion does not restate either the evidence before the Board on this issue or the findings of fact that the Board ultimately made, but it does uphold the Board's determination that the plaintiff's discharge was not related to his union activities. It follows that his discharge was unrelated to his exercise of first amendment rights to organize an employee organization, to participate in its activities, and to criticize the police department.

missible ground for the discharge in the complaint before this court. The factual conclusion in the state litigation that the plaintiff was discharged for cause, not in violation of the Municipal Labor Relations Act, is binding on this court and is dispositive of plaintiff's first amendment cause of action.

 The second issue before the court involves the Vermont State Labor Relations Board's determination that the plaintiff was a probationary employee at the time of his discharge and was therefore not entitled to notice and a hearing before being fired. The Board explicitly ruled that "[c]omplainant Ohland was a probationary police officer for one year from his April 5, 1973, date of hire" and that he was "dismissed during his probationary period without hearing for cause." (Printed Case at 19). If this court accepted the Board's ruling as conclusive, it would be necessary to dismiss the plaintiff's due process claim, because a probationary employee has no independent federal constitutional right to receive a hearing prior to discharge. *Bishop v. Wood*, 426 U.S. 340, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). We do not believe, however, that we should give the Board's determination in this matter collateral estoppel effect.

There has been no factual dispute among the parties over the date or manner of plaintiff's discharge, but there has been substantial disagreement with respect to his legal status at the time of his discharge. The Montpelier City Charter, Title IX, § 7 provides that "[a]ll persons hereafter appointed as regular police officers shall serve a six months' probationary period before such appointment becomes final." The city's Personnel Plan, on the other hand, permits department heads to establish probationary periods for new employees ranging from six to twelve months. The Montpelier Police Department has uniformly applied a twelve-month period. The dispute in this case has involved solely questions of law—namely, whether the Charter and the Personnel Plan are in conflict, and

if so, which would govern the establishment of probationary employment periods.

The policy justifications for according prior determinations of state tribunals collateral estoppel and res judicata effect in federal civil rights litigation become somewhat attenuated when administrative agencies are involved and are weaker still when the agency's decision turns solely on a question of law. As the Second Circuit stated in *Mitchell,*

> The distinction we draw for res judicata purposes between state administrative and state judicial proceedings is particularly valid in this case, where the legal merit of the complaint was resolved by the state agency. It is reasonable to question whether such a legal determination, when made only by administrative officials, should bar consideration of the complaint by a federal court.

*Mitchell v. National Broadcasting Co.*, 553 F.2d 265, 276 (2d Cir. 1977). Keeping in mind the importance of federal avenues for redress of civil rights claims and the limitations of administrative decisionmaking, we decline to be bound by the legal conclusion of the Vermont State Labor Relations Board on this matter.

Nor can we give any collateral estoppel effect to the subsequent decision of the Vermont Supreme Court on this issue. The court expressly declined to decide the issue of plaintiff's employment status, merely pointing out that "[i]t is fair to say that both he, his employer, and the Board considered his status to be a probationary one." *Ohland v. Dubay*, 133 Vt. 300, 303, 336 A.2d 203, 205 (1975). The court found plaintiff's employment status to be "irrelevant if the Board's determination of the focal issue regarding unfair labor practice is sustained." *Id.* It is obvious that no collateral estoppel effect can be granted to this language, particularly since plaintiff's employment status is, in fact, extremely relevant to his due process claim.

### IV. *The Due Process Claim*

We now turn to evaluation of the merits of plaintiff's remaining claim, an action in

damages for deprivation of his due process right not to be discharged except for cause and only after notice and a hearing before the city council. This action is brought under two distinct jurisdictional theories. The first is an action under 42 U.S.C. § 1983, and its jurisdictional counterpart, 28 U.S.C. § 1343, for redress for the deprivation of a constitutional right under color of state law. Under the second theory, plaintiff urges the court to find jurisdiction under the general federal question statute, 28 U.S.C. § 1331, and to imply a damage remedy directly under the Constitution for violation of his fourteenth amendment due process rights.

■ There are two distinct requirements for recovery for the violation of due process rights in an action brought under either the fourteenth amendment or § 1983: the defendant must have acted under color of state law, and the defendant's actions must have deprived the plaintiff of a federally secured liberty or property interest. *See, e. g., Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Monroe v. Pape*, 365 U.S. 167, 184, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). It is undisputed in this case that the defendants acted under color of state law, but they have argued strenuously that no federally secured liberty or property interest was involved.

■ This court has ruled otherwise. In an opinion and order dated February 10, 1977, we held, after thorough consideration of the applicable Vermont law, that the provisions of the Montpelier City Charter governed plaintiff's employment, and that he was therefore a probationary employee for only the first six months of his employment. Consequently, at the time of his discharge, he could have been discharged only for incompetence, neglect of duty or misconduct, and he was entitled to a pretermination hearing before the city council. City of Montpelier Charter, tit. IX, §§ 7, 14, 16. *See Rutter v. Burke*, 89 Vt. 14, 93 A. 842 (1915).

Because he could have been discharged only for cause, plaintiff had a property interest in his employment that was entitled to constitutional protection. *Bishop v. Wood*, 426 U.S. 341, 345 n.8, 96 S.Ct. 2074 n.8, 48 L.Ed.2d 684 n.8 (1976); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). It is undisputed that the plaintiff was not accorded the protections guaranteed him by the due process clause. Without advance notice, he received a form letter from the chief of police stating only, "you do not meet the standards of this Department." Defendant's Exhibit A. He was given neither a formal statement of reasons for his discharge, nor a hearing before the city council. Without repeating the reasons and support for our conclusions, we reaffirm our belief in the soundness of the prior order. Having determined that defendants violated plaintiff's due process rights, we must turn to the question of whether the relief he requests, monetary damages, is an appropriate remedy under either of the theories of recovery advanced.

### A. Recovery in Damages under § 1983

In enacting § 1983,[17] Congress created a far-reaching statute offering considerable flexibility for the vindication of constitutional rights. The Supreme Court has held that actions under § 1983 will lie against municipal defendants and that monetary damages are potentially an appropriate remedy in such cases:

---

17. 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof, to the deprivation of any rights, privileges, or immunities secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.

*Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978) (footnote omitted). The scope of relief under § 1983 is broader than the quoted language would indicate. In *Monell,* the Court also held that, when sued in their official capacity, the officials of a suable local entity are "persons" potentially liable under § 1983, and that governmental "custom," even if not formally endorsed by the lawmaking body, may give rise to § 1983 liability. *Id.* at 691, 98 S.Ct. 2018. Plaintiff's discharge in the circumstances of this case was undeniably an official act of the City of Montpelier pursuant to established city policies. Thus, plaintiff's cause of action does not suffer either because it is in part grounded on the actions of individual defendants sued in their official capacities or because the custom of the police department as to twelve-month probationary periods was never officially endorsed by the city council.

Nevertheless, in the circumstances presented here, we cannot hold the defendants liable for monetary damages under § 1983 due to their failure to accord plaintiff his due process rights, because they are entitled to a qualified good faith immunity [18] for acts undertaken in setting and enforcing an official policy reasonably thought to be constitutional and applied in a nondiscriminatory manner. This qualified good faith immunity applies to the individual defendants in their personal and representative capacities, and to the City of Montpelier as a corporate "person" subject to § 1983 liability. Taking each category of defendants in turn, we will treat first the question of the liability of the named defendants as they are sued in their individual capacities, and then turn to the question of official-capacity and municipal liability.

*Liability of the Individual Defendants*

The Supreme Court set forth the history of and rationale for the doctrine of qualified immunity for governmental officials in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974):

> Public officials, whether governors, mayors or police, legislators or judges, who fail to make decisions when they are needed or who do not act to implement decisions when they are made do not fully and faithfully perform the duties of their offices. Implicit in the idea that officials have some immunity—absolute or qualified—for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all.

*Id.* at 241–42, 94 S.Ct. at 1689 (footnote omitted).

These considerations have been considered especially significant when executive officials are sued as individuals for actions taken in the good faith performance of their official duties, because such liability would deter qualified persons from taking and exercising executive authority. *Wood v. Strickland,* 420 U.S. 308, 320, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). In enacting § 1983, Congress did not intend to impose strict liability for constitutional torts. Individual defendants have a qualified immunity measured by both objective and subjective tests of good faith. An individual is not

---

**18.** Technically, an immunity is a legal bar to a lawsuit, while good faith is an affirmative defense. *See* Lehman, *Bivens and its Progeny: The Scope of a Constitutional Cause of Action for Torts Committed by Government Officials,* 4 *Hastings Const.L.Q.* 531, 589 (1977). The courts have not adhered to this distinction. The "qualified good-faith immunity" set forth by the Supreme Court, *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), is actually a defense requiring a close examination of facts, including defendants' knowledge and motives, as well as the state of the law on the constitutional issue that is the focus of the suit.

liable under § 1983 unless "he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights" of the plaintiff, or "he took the action with a malicious intention to cause a deprivation of constitutional rights or other injury . . . ." *Id.* at 322, 95 S.Ct. at 1001.

In the case at bar, there has been no claim that the individual defendants acted maliciously or with discriminatory intent in denying plaintiff a pretermination hearing. The Vermont Supreme Court found that all of the parties involved in this case believed that the twelve-month probationary period was properly authorized. *Ohland v. Dubay*, 133 Vt. 300, 303, 336 A.2d 203 (1975). Moreover, defendants uniformly applied the period to all new officers in the police department. Thus, defendants' individual liability turns on the question whether they should have known that their actions would violate the constitutional rights of the plaintiff.

We do not believe any such duty existed in the present case. Whatever merit there may be in holding officials liable for unknowing violations of the well-established constitutional rights of others, we can find no justification for requiring officials to interpret unsettled law or to predict how courts may subsequently decide constitutional issues. *See McKinnon v. Patterson*, 568 F.2d 930, 934–35 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). The issue of the conflict between Montpelier's Charter and its Personnel Plan had not been determined by any court, or to our knowledge, even been raised in a judicial proceeding prior to plaintiff's discharge. Defendants' actions were reasonable under a statute believed to be valid and only later held to violate plaintiff's rights; they cannot be held liable in monetary damages for their good faith implementation of the city's Personnel Plan. *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Sullivan v. Meade Independent School District No. 101*, 530 F.2d 799 (8th Cir. 1976).

### *Liability of the Municipal Defendants*

We now consider the liability of the municipal defendants. The first question is whether the liability rules that apply to the individual defendants sued in their representative capacity differ from the rules that govern the liability of the City of Montpelier as a governmental entity. Both logic and established precedent support the conclusion that these defendants should be considered in one class.

Prior to the Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), it was settled doctrine that the federal courts had no jurisdiction under § 1983 to award damages against municipalities, states, or counties, because they were not "persons" within the meaning of that statute. *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Moor v. County of Alameda*, 411 U.S. 693, 707–10, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The lower federal courts were not in complete agreement as to whether the Supreme Court's rulings on public entity liability would nonetheless have permitted damage awards against municipal officials sued in their official capacities. *See Muzquiz v. City of San Antonio*, 520 F.2d 993 (5th Cir. 1975), *rev'd on rehearing en ·banc*, 528 F.2d 499 (1976), *vacated*, 438 U.S. 901, 98 S.Ct. 3117, 57 L.Ed.2d 1144 (1978); *Harkless v. Sweeny Independent School District*, 427 F.2d 319 (5th Cir. 1970), *cert. denied*, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971); *Black Brothers Combined v. City of Richmond*, 386 F.Supp. 147, 148 (E.D.Va.1974). The chief issue in these cases was whether or not municipal officials acting within their representative capacities ought to be treated as extensions of the municipality for the purposes of § 1983 damage actions, and thus be given immunity along with the municipality.

The Second Circuit adopted the better view in *Monell v. Department of Social Services*, 532 F.2d 259 (2d Cir. 1976), *rev'd on other grounds*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Monell*, the court of appeals rejected a number of arguments for creating different liability rules for local political entities and their officials. Noting that damage awards would come from the public treasury in either case, the court held that "[t]he mere substitution of the name of the official for the name of the city in the complaint cannot be used as a subterfuge to circumvent the intent of Congress." 532 F.2d at 266.

■ The Supreme Court endorsed this conclusion, noting that "official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Department of Social Services*, 436 U.S. 658, 690 n.55, 98 S.Ct. 2018, 2036 n.55, 56 L.Ed.2d 611 (1978). Because the Court held that municipalities were potentially liable under § 1983, it followed that "local government officials sued in their official capacities are "persons" under § 1983 in those cases in which, as here, a local government would be suable in its own name." *Id.* It is thus apparent that the liability rules for damage awards under § 1983 ought to be identical for local political entities and officials sued in their representative capacity.

■ The question remaining is what those liability rules should be.[19] The Supreme Court explicitly left this issue unresolved by declining to address "what the full contours of municipal liability under § 1983 may be," 436 U.S. at 695, 98 S.Ct. at 2038. More specifically, the Court expressed "no views on the scope of any municipal immunity beyond holding that municipal bodies sued under § 1983 cannot be entitled to an absolute immunity, lest our decision that such bodies are subject to suit under § 1983 'be drained of meaning.'" 436 U.S. at 701, 98 S.Ct. at 2041 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)) (additional citation omitted).

■ Although neither the Supreme Court nor the Second Circuit has ruled on the matter, we are not without guidance in determining the applicability to the municipal defendants of the good faith immunity doctrine. This guidance comes from the legislative history of § 1983 as interpreted by the Court in *Monell*, from earlier decisions involving the individual immunity of governmental officials and the policies underlying them, and from a number of cases considering the motives of governmental entities in analogous causes of action.[20]

**19.** This is a question of federal law alone. Defendant City of Montpelier asserts that it is immune under the Vermont law of municipal sovereign immunity, Vt.Stat.Ann. tit. 29, § 1403 (1970). Under Vermont law, a damage recovery can be had against a municipality for wrongs committed in the pursuance of governmental functions only to the extent that the municipality is covered by liability insurance. *Orleans Village v. Union Mutual Fire Insurance Co.*, 133 Vt. 217, 335 A.2d 315 (1975). It is unnecessary for the court to inquire into the liability coverage of the city, however, because it has "never been the law" that state law immunities could restrict the scope of a § 1983 cause of action. *Monell v. Dep't of Social Services*, 436 U.S. 658, 695 n.59, 98 S.Ct. 2018 n.59, 56 L.Ed.2d 611 (1978). Although the Court has found common-law immunities instructive in constructing individual immunities in § 1983 actions, *Imbler v. Pachtman*, 424 U.S. 409, 421, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the scope of § 1983 cannot be limited by state governmental immunities. Deference to state

doctrines of sovereign immunity could render the Court's interpretation of § 1983 "drained of meaning." *Monell v. Dep't of Social Services*, 436 U.S. 658, 701, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

**20.** Our broad consideration of policy issues and analogous authority is not unusual in this area of the law. Concerning the scope of judicially-created remedies for constitutional violations, Justice Harlan has written:

[I]t seems to me that the range of policy considerations we may take into account is at least as broad as the range of those a legislature would consider with respect to an express statutory authorization of a traditional remedy.

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 407, 91 S.Ct. 1999, 2010, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring). The Supreme Court has also stated that § 1983 "should be read against the background of tort liability," *Monroe v.*

This authority and strong reasons of policy persuade us that the § 1983 liability of local governmental entities should be limited by a qualified good faith immunity parallel to that applicable to individual government employees.

When Congress enacted § 1983 in 1871 (as § 1 of the Civil Rights Act) its proponents argued that, as a remedial statute, its terms "ought to be construed liberally" and should be given the "largest latitude consistent with the words employed." Remarks of Representative Shellabarger, Cong.Globe, 42d Cong., 1st Sess., App. at 68 (1871). While § 1983 has been the fountainhead of an enormous body of litigation for the redress of constitutional wrongs, the liberal construction of the act is not without limits. The courts have repeatedly imposed reasonable restrictions on the applicability of § 1983 in accord with important public policies and their interpretation of Congress' intent in enacting the Civil Rights Act. *See, e. g., Monell v. Department of Social Services*, 436 U.S. 658, 691–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (rejecting municipal liability based on *respondeat superior*); *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (judicial immunity bars § 1983 action); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (executive immunity).

The legislative history of the Act as a whole reveals Congress' intent to impose liability under § 1983 only when the defendant was in some sense acting wrongfully with respect to the rights of the plaintiff and only when liability could reasonably and justly be expected to deter that wrongful conduct. Because § 1 of the 1871 legislation was enacted without substantial debate or amendment, its legislative history is not very instructive. Congress' intentions appear, however, in the debates and history of the Sherman amendment, which would have become § 7 of the 1871 Act, but which

failed passage by Congress. The Sherman amendment would have imposed liability on a municipality for property losses and other damages sustained by the victims of organized private violence,

> whether or not it had notice of the impending riot, whether or not the municipality was authorized to exercise a police power, whether or not it exerted all reasonable efforts to stop the riot, and whether or not the rioters were caught and punished.

*Monell v. Department of Social Services*, 436 U.S. 658, 668, 98 S.Ct. 2018, 2024, 56 L.Ed.2d 611 (1978) (footnote omitted). Congress rejected the proposal to impose vicarious liability on local governments and local taxpayers for the constitutional torts of private citizens. The Supreme Court has suggested that this rejection was not due to a congressional belief that municipalities were immune from federally-created damage actions, but rather was a reaction to the fear that the amendment would have imposed damages "without regard to whether a local government was *in any way at fault* for the breach of the peace for which it was to be held for damages." *Id.* at 681 n.40, 98 S.Ct. 2031 n.40. (emphasis added). Congress' rejection of the amendment can then be understood "as a limitation of the statutory ambit to actual wrongdoers, i. e., a rejection of *respondeat superior* or any other principle of vicarious liability." *Id.* at 707, 98 S.Ct. at 2044 (Powell, J., concurring) (citation omitted).

The debates on the Sherman amendment also reveal Congress' concern with the effectiveness of the provisions of the Act to deter unlawful conduct. The amendment's proponents argued that vicarious liability would have a salutory deterrent effect through increased political pressure on public officers. *See Monell*, 436 U.S. at 667, 98 S.Ct. 2018. Opponents pointed out that local government liability would not neces-

---

*Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961), and the Second Circuit has observed that the experience of the common law is "a valuable source of instruction in arriving at minimum standards for imposition

of liability based essentially on tortious conduct, whether or not it be labelled as a violation of a constitutional or some other right." *Brault v. Town of Milton*, 527 F.2d 730, 740 (2d Cir. 1975).

sarily deter unlawful conduct if liability were imposed on government entities without regard to their officers' knowledge of unlawful conduct or their legal authority to act to preserve constitutional rights. Representative Willard, for example, argued:

> But it seems very clear to me that if there is in the Constitution any power vested in Congress to resort to a provision like this for the punishment of offenses, or for giving redress to persons injured, this is very clearly an unwise and improper exercise of that power. . . . [T]he state . . . has the creation and the control of the laws for the protection of the people. . . . What can a city do, to give me the equal protection of the laws? The city and the county have no power except the power that is given them by the State. They cannot keep violence away from me; they cannot protect me in my rights, except as the State has clothed them with power to do so . . . . We should never impose an obligation upon a community when we do not and cannot give that community the power to discharge that obligation.

Cong.Globe, 42d Cong., 1st Sess., at H. 791 (1871).

Proponents of the Sherman amendment also advanced an insurance theory for imposing municipal liability independent of the wrongfulness of the government's actions or the deterrent effect that liability might have. But, as the Supreme Court pointed out in *Monell*, 436 U.S. at 694, 98 S.Ct. 2018, the theory of "mutual insurance" was obviously insufficient to sustain passage of the amendment, and without explicit congressional direction, we should be extremely reluctant to impose municipal liability for § 1983 violations under a loss-spreading or mutual insurance rationale. *Id.* at 692 n.57, 98 S.Ct. 2018 n.57.

We have found no reported decision that applies these considerations to the question of whether a qualified good faith immunity exists for municipal violations of § 1983. The Supreme Court, however, carefully considered these issues when it ruled in *Monell* that there was sufficient support neither in policy nor in the legislative history of § 1983 to justify the application of the doctrine of *respondeat superior* to § 1983 actions for damages against municipalities. *Monell*, 436 U.S. at 691–95, 98 S.Ct. 2018.

The Court's decision in *Monell* is an extension of its prior holding in *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), that an action will not lie under § 1983 for injunctive relief against individual government officials who are not directly involved in § 1983 violations but who are sued only on the basis of their supervisory authority. The Second Circuit has reached the same conclusion to limit the § 1983 damages liability of supervisory personnel. *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973).

The same policy considerations underlying the *respondeat superior* decisions support the application of a qualified good faith defense to municipal as well as individual defendants in § 1983 actions. To begin with, the concept of "wrongfulness" extends beyond the question of causation alone. *Rizzo* and *Monell* hold that a governmental entity is liable under § 1983 only if its policies or customs are the actual cause of the plaintiff's injury. But liability for constitutional torts, as for other torts, turns also on whether the defendant acted wrongfully in causing that injury. The courts have held repeatedly that governmental officials should not be found liable in damages for § 1983 violations if they reasonably believed that their actions were constitutional and they did not act with any malicious intention toward the injured plaintiff. *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). If the governmental decision-makers responsible for an unconstitutional policy or custom satisfy this good faith test, then the government, as an entity, has not acted wrongfully even if the constitutional rights of the plaintiff have been abridged.

Nor do other considerations advanced in favor of vicarious liability counsel for the

imposition of strict liability against governmental entities acting in good faith. Such liability would be of questionable value as an additional deterrent to unconstitutional conduct, since by its terms the good faith defense requires a reasonable belief that the conduct ordered or approved of was constitutional. The retroactive application of damage awards to situations where public decisionmakers "could not reasonably have been expected to be aware of a constitutional right that had not yet been declared," *Procunier,* 434 U.S. at 565, 98 S.Ct. at 861, cannot deter unconstitutional conduct unless decisionmakers are expected to be prescient. More realistically, retroactive liability would either not affect public decisionmaking at all, or would paralyze decisionmaking with continual reference to advisory prognostications, the imposition of unnecessary procedural protections, and the avoidance of politically controversial issues that might result in § 1983 suits.

The argument for imposing liability on the government as an insurer is no stronger in the context of the good faith defense than it is when the government is sued under the doctrine of *respondeat superior.* As pointed out above in the *respondeat superior* context, both Congress and the Supreme Court have rejected the notion. Although the Court has held that municipalities cannot be immune from suit simply because of the fear of "financial ruin that civil rights liability might impose," *Monell,* 436 U.S. at 664 n.9, 98 S.Ct. at 2023 n.9, it does not follow that governmental entities should be made liable without fault in order to compensate past "victims" of governmental conduct which was not known to be unconstitutional at the time it occurred. It might be argued that such awards are part of the price that all citizens must pay for the benefits of governmental decisions and programs. *See* Note, *Damage Remedies Against Municipalities for Constitutional Violations,* 89 Harv.L.Rev. 922, 956–57 (1976). On the other hand, as the Second Circuit has pointed out in an analogous context, "while allowing recovery for unconstitutional behavior on the part of the municipality is fair and reasonable, we

should not· needlessly expand recovery at the expense of already overburdened taxpayers." *Turpin v. Mailet,* 579 F.2d 152, 165 (2d Cir.), *vacated sub nom West Haven v. Turpin,* —— U.S. ——, 99 S.Ct. 554, 58 L.Ed.2d 645 (1978).

We hesitate to extend the logic of strict liability in the realm of private enterprise to the governmental arena. Taxpayers are not private investors willingly accepting the risks of doing business in return for anticipated profits. Moreover, governments, unlike private businesses, cannot choose to avoid acting in areas of greater risk. Nor can governments minimize liability for constitutional torts by engaging in "product development" or improved procedures when the contours of future constitutional decisions are unknown, and the rights of different groups of possible plaintiffs are potentially in conflict. *Compare The T. J. Hooper,* 60 F.2d 737 (2d Cir.), *cert. denied,* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932), *with Goode v. Rizzo,* 506 F.2d 542 (3d Cir. 1974), *rev'd,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

Because so many governmental decisions affect large numbers of potential plaintiffs, a rule of retroactive liability would pose a substantial threat to the quality and efficiency of governmental decisionmaking. The losses that some persons may be forced to bear because a court's finding of unconstitutionality comes too late are not fundamentally different from the losses that many individuals bear as a result of governmental decisionmaking in the areas of health and safety and economic regulation. *See Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). In all of these cases, absent an explicit legislative determination that these losses will be shared, they should be considered part of the accepted risk attending governmental decisionmaking in a complex society.

Plaintiff contends, and the argument has been made in many other cases, that the words of § 1983 are explicit in imposing liability and do not permit the application of any mitigating doctrines such as the good faith defense. *See, e. g., Pierson v. Ray,* 386 U.S. 547, 559, 87 S.Ct. 1213, 18

L.Ed.2d 288 (1967) (Douglas, J., dissenting). This argument must yield in light of the Act's legislative history, discussed earlier, and in view of the long line of cases finding either absolute immunities or good faith defenses for individual "persons" in § 1983 actions. These cases have read into § 1983 the common law doctrines of official immunity and their underlying policies; these policies are instructive in resolving the question of municipal immunity in the case at bar.

Although the language and legislative history of § 1983 reveal Congress' intention to expose state officials to liability in damages in some circumstances, the courts have limited the scope of the section by preserving the absolute common law immunities to officials acting in the legislative and judicial realms. *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (judges); *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (prosecutors); *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (legislators). Courts have granted a qualified immunity to numerous executive officials. *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) (state prison officials); *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (superintendent of state hospital); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (school board members); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (state governor, president of state university, officers and members of state national guard); *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (policemen). A review of these cases discloses a common policy underpinning—"the public interest requires decisions and action to enforce laws for the protection of the public," *Scheuer*, 416 U.S. at 241, 94 S.Ct. at 1689; therefore, "immunity is necessary to protect the decisionmaking process in which the official is engaged," *Imbler*, 424 U.S. at 435, 96 S.Ct. at 997 (White, J., concurring). These cases have considered only the inhibiting effect of personal liability on public officials, yet it is logical to conclude that strict liability for constitutional torts would have a considerable undesirable impact on public decision-making even if liability were limited to the governmental agencies alone.

Several observations support this conclusion. First, while it is true that personal liability would be much more immediate, public officials committed to the missions of their agencies are also concerned about the impact of tort liability on their operating budgets. Damage awards in § 1983 actions would necessarily subtract from the limited resources available for budgeted public programs. In addition, officers may reasonably fear that the imposition of awards against their agencies would be a negative factor in their future promotions and career opportunities. Finally, the possible harassment effect of unfounded litigation would cause a deflection of agencies' energies and officers' time from their public duties, and would impose additional expenses upon the agencies' budgets. *See Imbler v. Pachtman*, 424 U.S. 409, 423, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Where large damage awards are feared because governmental decisions affect large numbers of people— for example, in school districting, capital budgeting and public employment policies— the absence of a good faith defense to public entity liability under § 1983 could impede principled, effective decisionmaking even more dramatically. The logic of the cases finding an individual good faith immunity supports the extension of the defense to governmental entity defendants.

Our inquiry by no means ends with the determination that the qualified good faith defenses available to local governmental officials are also available to governmental entities in § 1983 actions for damages. We must still decide how the good faith of a governmental entity is to be determined, and we must apply that scrutiny to the facts of the case before the court. *Monell* instructs us that § 1983 does not impose liability upon a municipal government unless the government "under color of some official policy, 'causes' an employee to violate another's constitutional rights." 436

U.S. at 692, 98 S.Ct. at 2036. Since a municipality can act only through its agents, its reasonableness and intentions can only be inferred from the actions and policy determinations of those in high office considered in light of all of the circumstances of the case. *See Turpin v. Mailet*, 579 F.2d 152, 164 (2d Cir.), *vacated on other grounds sub nom West Haven v. Turpin*, —— U.S. ——, 99 S.Ct. 554, 58 L.Ed.2d 645 (1978). While such inferences are not always easily drawn, they are not beyond the competence of courts, and they have frequently been drawn in the context of constitutional claims involving fact patterns considerably more subtle than that here. *See, e. g., Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977) (determining whether racial discrimination in zoning was purposeful "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."); *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976) (motives behind city's hiring practices "may often be inferred from the totality of the relevant facts"); *Arastra Limited Partnership v. City of Palo Alto*, 401 F.Supp. 962 (N.D.Cal.1975) (finding city lacked good faith in enacting open space zoning ordinance).

Although the complaint does not set forth specifically the grounds alleged for municipal liability, there are only three ways in which the city's official policies and customs give rise to a cause of action. First, in enacting its Personnel Plan for city employees, the city council authorized the adoption of personnel practices that would be invalid under the City Charter. Second, acting under this invalid grant of authority, the police department applied a probationary period that impermissibly denied some new officers certain job protections and the right

to a pretermination hearing after six months of employment. Finally, plaintiff was fired in accordance with that policy and practice.

■ As stated earlier, the good faith defense applied to individual executive officials in § 1983 actions has both subjective and objective elements, *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), both of which must be considered here. With respect to the first element, there has been no claim that any of the city's official acts noted above was taken with a "malicious intention to cause a deprivation of constitutional rights or other injury" to the plaintiff. *Id.* at 322, 95 S.Ct. at 1001. Whether the city as an entity knew or reasonably should have known that the actions its policies caused to be taken would violate the constitutional rights of the plaintiff might in some cases be difficult to determine. Finding the individual named defendants protected by a qualified good faith immunity does not necessarily lead to the conclusion that the governmental entity should also be immune, because the municipality's immunity is not merely derivative.[21] For this cause of action, it is necessary for the courts to look beyond the state of knowledge and responsibilities of the named individual defendants and to construct a good faith standard for the city as an entity, taking into account the nature of the legislative and administrative processes and the knowledge of the city's legislative and executive officers and its legal advisors.

■ Under the circumstances of this case, however, it is unnecessary to delineate these factors precisely, because none of the potentially relevant actors—including city council members, the city attorney, the city manager and the police chief—knew or had reason to know that the city's Personnel Plan was unconstitutional as applied to the probationary period of police officers. Nor,

---

**21.** We have found only one decision in which the court even impliedly considered this question. In *Hostrop v. Board of Junior College District No. 515*, 523 F.2d 569 (7th Cir. 1975), *cert. denied*, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976) the court found a school board liable in damages for deprivation of pro-

cedural due process even though the individual board members had good faith immunity. This decision involved a direct cause of action under the Constitution, not a § 1983 action, and the court did not address the question whether a separate good faith defense should be available to the school board as an entity.

as stated above, has there been any allegation of malice on the part of any of these actors in promulgating and enforcing the Personnel Plan. Consequently, the city as an entity is not liable in damages for deprivation of the plaintiff's due process rights.

### B. Recovery in Damages Directly Under the Fourteenth Amendment

Following the Second Circuit's decision that the federal courts had jurisdiction under 28 U.S.C. § 1331(a) to entertain a suit for damages against a municipality on a cause of action grounded directly on the fourteenth amendment, *Turpin v. Mailet*, 579 F.2d 152 (2d Cir.), *vacated sub nom West Haven v. Turpin*, —— U.S. ——, 99 S.Ct. 554, 58 L.Ed.2d 645 (1978), this court agreed to consider such a cause of action against the City of Montpelier in the present case. We now hold that a damage remedy against the City of Montpelier should not be implied under the fourteenth amendment.

The courts have generally shown great reluctance to exercise the judicial power to create a damage remedy in cases arising directly under the constitution. In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court held that an action for damages could be implied against federal officers under the fourth amendment. The lower federal courts have split on the question of whether similar actions would lie against municipal officers or entities directly under the fourteenth amendment. *Compare Owen v. City of Independence*, 560 F.2d 925 (8th Cir. 1977), *vacated* 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1145 (1978), *and Turpin v. Mailet*, 579 F.2d 152 (2d Cir.), *vacated sub nom West Haven v. Turpin*, —— U.S. ——, 99 S.Ct. 554, 58 L.Ed.2d 645 (1978), *with Kostka v. Hogg*, 560 F.2d 37 (1st Cir. 1977).

Although not directly deciding the issue, the Supreme Court referred to this question in *Monell*. Justice Powell, concurring, stated:

Rather than constitutionalize a cause of action against local government that Congress intended to create in 1871, the better course is to confess error and set the record straight, as the Court does today.

436 U.S. at 713, 98 S.Ct. at 2047 (footnote omitted). The Court subsequently vacated and remanded the *Turpin* and *Owen* cases for reconsideration in light of its decision in *Monell*. 438 U.S. 902, 98 S.Ct. 3118 (1978); —— U.S. ——, 99 S.Ct. 554 (1978). Upon reconsideration, the Second Circuit concluded that "there is no place for a cause of action against a municipality directly under the 14th Amendment, because the plaintiff may proceed against the [municipality] under § 1983." *Turpin v. Mailet*, 591 F.2d 426, 427 (2d Cir. 1979). Because the plaintiff herein has stated a cause of action under § 1983 we decline to imply the existence of a remedy directly under the Constitution. *See Cale v. City of Covington*, 586 F.2d 311 (4th Cir. 1978), *Smith v. Ambrogio*, 456 F.Supp. 1130, 1134 (D.Conn.1978).

There is no inconsistency between this holding and our conclusion above that the plaintiff cannot recover damages because the municipal defendants have a good faith defense. To begin with, *Bivens* implies that specific congressional action would preclude judicial creation of a damages remedy against the federal government, 403 U.S. at 397, 91 S.Ct. 1999, and judicial restraint is even more appropriate where judicially-created federal remedies may intrude into state and local governmental decisionmaking. *Molina v. Richardson*, 578 F.2d 846, 850–53 (9th Cir. 1978), *cert. denied*, —— U.S. ——, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978). The municipal good faith defense is, as noted below, based on Congress' intentions in constructing § 1983, and we are reluctant to avoid that intention by holding that a direct cause of action is permitted where municipal good faith would bar a § 1983 action for damages. Moreover, we believe that the policy underpinning of the good faith defense applies equally to direct constitutional actions. It is thus unlikely that a plaintiff would be able to recover directly under the constitu-

tion when a good faith defense barred recovery in a § 1983 cause of action.[22]

## V. Attorney's Fees

The parties have filed requests for the award of attorney's fees under the provisions of the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. That statute by its terms allows the court to award fees to the "prevailing party" in a civil rights case brought under 42 U.S.C. § 1983. These motions raise two questions: first, is the plaintiff herein a "prevailing party" within the meaning of the statute; and second, if he is not, does the statute authorize an award of fees to the municipal defendants? Since we conclude, for the reasons stated below, that the answer to both of these questions is "no", we must deny the parties' motions for the award of fees.

■ Plaintiff's motion for the award of fees turns on the meaning of the words "prevailing party," because the statute does not authorize the award of fees unless the plaintiff has prevailed in the action. We cannot find that the plaintiff here prevailed. Although "[a] party need not win a full trial on the merits to be said to prevail," at the least, "the lawsuit must have resulted in or been the catalyst of a victory" for the plaintiff in order to come within the meaning of the act. *N.A.A.C.P. v. Bell,* 448 F.Supp. 1164, 1166 (D.D.C.1978) (citations omitted). It is not necessary for a plaintiff to succeed on every issue. Rather, the focus of the court should be on a more generalized question, namely whether the party "has accomplished the objectives of his litigation." *Id.*

■ In this case, plaintiff has not accomplished his objectives; he has pursued only a remedy in damages and has been denied recovery in damages altogether. Adverse state court rulings defeated his equal protection and first amendment claims. The recovery requested in the due process claim failed because of the good faith immunity defense. In this prolonged and complicated litigation, plaintiff has won a favorable ruling on only one subsidiary issue of importance—the court's ruling of February 10, 1977, that he was entitled to notice and a hearing prior to his discharge.

■ To hold that this ruling would entitle plaintiff to an award of fees as a "prevailing party," however, would stand § 1988 on its head. The cases point out that to require a plaintiff to prevail on all issues in order to recover fees would undercut the purposes of the act, because it would stifle the presentation of innovative causes of action and would force courts to rule on every issue in a case, even if its rulings would be redundant. Similarly, to require a *defendant* to prevail on every subsidiary issue in order to defeat a claim for an award of fees would encourage the pursuit

---

**22.** Good faith defenses have been found to bar recovery in damages in a range of cases involving causes of action arising directly under the Constitution. *See Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (good faith immunity for federal administrative officials sued for first and fifth amendment violations); *Kermit Construction Co. v. Banco Credito Y Ahorro Poncano,* 547 F.2d 1, 3 (1st Cir. 1976) ("[T]he immunity of various governmental officers from damages under § 1983 rests on policies that apply as strongly to actions based directly on the Fourteenth Amendment."); *Brault v. Town of Milton,* 527 F.2d 730 (2d Cir. 1975) (town's good faith enforcement of zoning law bars cause of action for fourteenth amendment due process violation); *Hostrop v. Board of Junior College Dist. No. 515,* 523 F.2d 569 (7th Cir. 1975), *cert. denied,* 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976) (school board members entitled to official immunity in fifth amendment due process case); *Sanfilippo v. County of Santa Cruz,* 415 F.Supp. 1340 (N.D.Cal.1976) (recognizing good faith of local government as defense to action for damages in fifth and fourteenth amendment takings case). The Supreme Court has stated that it would be "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). The logic of these decisions is applicable to the question of municipal immunity in a constitutional cause of action in much the same way as the logic of the cases finding individual good faith defenses is applicable to the question of municipal immunity in § 1983 actions.

of theoretical issues that would complicate and prolong the litigation without altering its outcome. Unless awards were to be made to both parties, an outcome apparently not anticipated by Congress or yet approved by the courts, such a rule could reduce the term "prevailing party" to "prevailing plaintiff." Congress did not intend this result. In the instant case, the plaintiff pursued only a damages action. He did not seek an injunction ordering reinstatement or a pretermination hearing. He did not bring a class action to secure the rights of all probationary police officers who might be denied a hearing before discharge between the sixth and twelfth months of service. The court has thus not had the opportunity to consider or rule on any of these questions, and it would be inappropriate to surmise whether plaintiff would have prevailed in securing some form of positive relief if he had chosen to pursue different remedies. The attorney's fees statute requires objective, not theoretical recovery.[23]

 Defendants' motion for an award of fees must also be denied, despite their having prevailed in the litigation. In enacting § 1988, Congress intended to advance the remedial purposes of the civil rights acts. To ensure that the prospect of having to pay defendants' attorney's fees would not deter civil rights litigants from bringing good faith actions, Congress indicated that courts should not grant fees to a prevailing defendant unless the plaintiff's "suit was clearly frivolous, vexatious or brought for harassment purposes." S.Rep. No.1011, 94th Cong., 2d Sess. 5, *reprinted in* [1976] U.S.Code Cong. & Ad.News, 5908, 5912.

In civil rights litigation, courts have interpreted fee award provisions to entitle prevailing defendants to awards when plaintiffs pursue suits that are without a reasonable legal basis, regardless of plaintiff's subjective intent. *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) (interpreting fee

award provision for Title VII claim, 42 U.S.C. § 2000e–5(k)); *Prate v. Freedman*, 583 F.2d 42 (2d Cir. 1978) (interpreting 42 U.S.C. § 2000e–5(k)). *Accord, Griffin v. Collins*, 443 F.Supp. 1010 (S.D.Ga.1978) (construing § 1988). As may be obvious from the court's extended discussion of the legal issues raised in this case, we do not find plaintiff's claims to have been groundless, vexatious, or frivolous. Defendants' motion for award of fees is therefore denied.

Judgment is to be entered for the defendants. The parties will bear their costs.

---

**23.** *See Harrington v. Vandalia-Butler Bd. of Ed.*, 585 F.2d 192, 197–98 (6th Cir. 1978), reversing a fee award in a Title VII employment discrimination case despite a finding of discrimination, because plaintiff's voluntary retirement barred recovery under the only forms of relief to which she would have been entitled.